*400 MARKMAN, J.
(dissenting), Following a jury trial, defendant was convicted of involuntary manslaughter under MCL 750.321, which carries a statutory maximum sentence of 15 years. The trial court sentenced defendant to a term of 8 to 15 years after departing upward from the statutory sentencing guidelines range of 43 to 86 months for defendant’s minimum sentence. The court calculated the range by scoring various offense and prior record variables under a preponderance of the evidence standard. Defendant appealed his sentence, asserting that it was imposed contrary to the United States Supreme Court’s decision in Alleyne v United States, 570 US_; 133 S Ct 2151; 186 L Ed 2d 314 (2013), because his minimum sentence had been determined on the basis of facts that were not found by the jury beyond a reasonable doubt. The Court of Appeals affirmed defendant’s sentence, and this Court granted leave to appeal to determine whether Michigan’s “indeterminate” sentencing system, which allows a trial court to set a criminal defendant’s minimum sentence, i.e., his or her parole eligibility date, on the basis of factors determined by a preponderance of the evidence, is in violation of the Sixth Amendment of the United States Constitution. The majority holds today that our state’s sentencing system does, in fact, violate the Sixth Amendment. Because I respectfully disagree with this holding and do not believe our sentencing system violates the Constitution, I dissent.
I. FACTS AND HISTORY
The victim in this case, Ms. Kenyatta Lockridge, and defendant were married and had a history of domestic violence. This history resulted in defendant’s being placed on probation, a condition of which was that he *401 not have contact with Ms. Lockridge or visit her residence. Defendant, however, continued to have contact with Ms. Lockridge and continued to live at her residence. On September 19, 2011, Ms. Lockridge accused defendant of stealing money from her purse and an argument ensued. The argument eventually turned violent when Ms. Lockridge punched defendant in the face twice. In response, defendant placed his arm around Ms. Lockridge’s neck and proceeded to place her in a choke hold. Once Ms. Lockridge stopped resisting, defendant dropped her on the floor in front of their three daughters and left the house. Ms. Lockridge was declared dead at the hospital, the cause of her death being asphyxiation due to neck compression.
Defendant was charged with one count of open murder, MCL 750.316, and on May 4, 2012, the jury found defendant guilty of involuntary manslaughter, MCL 750.321. At sentencing, the trial court scored defendant’s offense variables and prior record variables and determined that his offense variable level was 70 points and his prior record variable level was 35 points. See footnote 10 of this opinion. These figures placed defendant in the D-V cell of the Class C sentencing grid, which contains a recommended minimum guidelines range of 43 to 86 months. MCL 777.16p; MCL 777.64. The trial court further held that there were substantial and compelling reasons to depart upward from the guidelines range by 10 months, ultimately sentencing defendant to a term of 8 to 15 years. The trial court justified its departure by citing offense variables that assertedly failed adequately to take into account the psychological injury suffered by the victim’s children, while also referring to defendant’s willful disregard for the conditions of his probation.
Defendant appealed his sentence in the Court of Appeals. Pending that court’s consideration, the Su *402 preme Court decided Alleyne v United States, which held that “any fact that increases the mandatory minimum is an ‘element’ that must be submitted to the jury.” Alleyne, 570 US at _; 133 S Ct at 2155. Defendant claimed that he had been sentenced to a term of incarceration that had been unconstitutionally enhanced by judicial, not by the required jury, fact-finding, and the Court of Appeals allowed him to add an additional claim under Alleyne to his appeal. Ultimately, the Court of Appeals denied defendant’s claim, citing People v Herron, 303 Mich App 392; 845 NW2d 533 (2013), for the proposition that our indeterminate sentencing system does not offend the Sixth Amendment and noting that the panel was required to follow Herron. People v Lockridge, 304 Mich App 278, 284; 849 NW2d 388 (2014) (opinion by O’CONNELL, J.); id. at 285 (opinion by BECKERING, P.J.); id. at 311 (opinion by Shapiro, J.).
II. STANDARD OF REVIEW
The issue in this case is whether Michigan’s sentencing system operates in violation of the Sixth Amendment of the United States Constitution by permitting a criminal defendant’s minimum sentence to be determined on the basis of facts not proved to the jury beyond a reasonable doubt. A Sixth Amendment challenge presents a question of constitutional law that we review de novo. People v Nutt, 469 Mich 565, 573; 677 NW2d 1 (2004). Furthermore, a constitutional challenge to a statute presents a question of law that is also reviewed de novo. McDougall v Schanz, 461 Mich 15, 23; 597 NW2d 148 (1999). In analyzing constitutional challenges to statutes, this Court’s “authority to invalidate laws is limited and must be predicated on a clearly apparent demonstration of unconstitutional *403 ity.” People v Harris, 495 Mich 120, 134; 845 NW2d 477 (2014). We require a challenge to meet such a high burden because “[s]tatutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent.” In re Sanders, 495 Mich 394, 404; 852 NW2d 524 (2014), citing Taylor v Gate Pharm, 468 Mich 1, 6; 658 NW2d 127 (2003).
III. ANALYSIS
A. SIXTH AMENDMENT
The Sixth Amendment of the United States Constitution provides:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation .... [US Const, Am VI.]
This amendment pertains to one of the most fundamental elements of our equal rule of law—the right to a trial by jury.[1] The fundamental purpose of the right to a trial by jury is indisputably “to prevent oppression by the Government.” Duncan v Louisiana, 391 US 145, 155; 88 S Ct 1440; 20 L Ed 2d 491 (1968), citing Singer v United States, 380 US 24, 31; 85 S Ct 783; 13 L Ed 2d 630 (1965). “Given this purpose, the essential feature of a jury obviously lies in the interposition between the *404 accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group’s determination of guilt or innocence.” Williams v Florida, 399 US 78, 99; 90 S Ct 1893; 26 L Ed 2d 446 (1970).[2] Stated another way, the “Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged . . . .”[3] United States v Gaudin, 515 US 506, 511; 115 S Ct 2310; 132 L Ed 2d 444 (1995).
B. SIXTH AMENDMENT AND SENTENCING
The Sixth Amendment requires “a jury determination that [a defendant] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.” Id. at 510. In defining the protections afforded *405 by this right, the United States Supreme Court has held that any fact that constitutes an “element” of the crime must be determined by the jury, not by the court, beyond a reasonable doubt. Apprendi v New Jersey, 530 US 466, 494; 120 S Ct 2348; 147 L Ed 2d 435 (2000). The breadth of this right therefore depends on “the proper designation of the facts that are elements of the crime.” Alleyne, 570 US at_; 133 S Ct at 2156. To ensure that the right to a jury trial is properly safeguarded, the United States Supreme Court has set out to explain what exactly constitutes an “element” of a crime for purposes of the Sixth Amendment, so that the necessary elements will be submitted to the jury for its consideration and determination.[4] In its efforts to explain what constitutes an “element” of a crime, the Supreme Court has identified several sentencing practices that operated in violation of the Sixth Amendment.
The Supreme Court first addressed the Sixth Amendment implications that arise when judicially ascertained facts are used to enhance a criminal defendant’s sentence in McMillan v Pennsylvania, 477 US 79; 106 S Ct 2411; 91 L Ed 2d 67 (1986). McMillan involved a Pennsylvania statute that imposed a five year “mandatory minimum” sentence when the trial court determined by a preponderance of the evidence that the defendant “visibly possessed a firearm” during *406 the course of committing an enumerated felony. Id. at 81. In a 5-4 decision, the Court upheld the Pennsylvania statute, concluding that it
neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court’s discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. [Id. at 87-88.]
Because the imposition of the mandatory minimum sentence had not altered the maximum penalty authorized by the jury’s verdict, the Court sustained the statute, rejecting a Sixth Amendment challenge.
While McMillan sanctioned the use of judicial fact-finding to establish a mandatory minimum sentence, a decade later in Jones v United States, 526 US 227, 239; 119 S Ct 1215; 143 L Ed 2d 311 (1999), the Supreme Court cautioned that the use of such facts to increase the maximum sentence presented “grave and doubtful constitutional questions.” (Quotation marks and citation omitted.) In Jones, the defendant was convicted of violating a carjacking statute, which called for a 15-year maximum sentence. 18 USC 2119. This sentence, however, could be increased to 25 years if the judge determined by a preponderance of the evidence that the victim had suffered serious bodily injury, or to life in prison if the victim had died. 18 USC 924(c). Three tiers of sentencing were provided under the statute. The trial court imposed the 25-year sentence after it found that the victim had suffered serious bodily injury. Jones, 526 US at 231. The Supreme Court, however, vacated the sentence in a 5-4 decision, holding that the defendant’s Sixth Amendment right to a jury trial was violated because the judge had determined by a preponderance of the evidence that the *407 victim suffered “serious bodily injury,” rather than the jury’s having determined the same question beyond a reasonable doubt. Id. at 252.
In Jones, the jury found all the elements necessary to incarcerate the defendant for 15 years and that finding conferred on him not only the legal obligation of potentially having to serve a sentence of that length, but also a concomitant legal right to a sentence not exceeding that length.[5] By its finding of facts that resulted in an increase in this level of punishment by 10 years, the trial court deprived the defendant of his legal right to a sentence that did not exceed 15 years, i.e., his legal right to a sentence that did not exceed the maximum term allowed by the jury’s verdict. The Court held that this type of judicial fact-finding violated the Sixth Amendment.
The following term in Apprendi v New Jersey, 530 US 466, the Supreme Court elaborated on its analysis in Jones. In Apprendi, the defendant pleaded guilty to one count of possessing a weapon for an unlawful purpose, which was punishable by a term of imprisonment between 5 and 10 years. Id. at 468-469. New Jersey, however, had a statutory “hate crime” law that *408 provided for an extended term of imprisonment between 10 and 20 years when the trial court found by a preponderance of the evidence that the defendant had acted with “racial bias.” The trial court in Apprendi found the requisite “racial bias” by a preponderance of the evidence and consequently sentenced the defendant to an enhanced 12-year term. Id. at 471. In yet another 5-4 decision, the Supreme Court held that New Jersey’s practice of enhancing a criminal defendant’s sentence on the basis of judicial fact-finding was unconstitutional. Id. at 490. The Court held:
“[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. ... [S]uch facts must be established by proof beyond a reasonable doubt.” [Id., quoting Jones, 526 US at 252-253 (first alteration in original).]
Stated another way, judicially ascertained facts were used by the trial court to deprive the defendant of his constitutional right to a criminal sentence not exceeding that authorized by the jury’s verdict. The Court was not persuaded by the statute’s characterization of a “biased purpose” as a mere “sentencing enhancement” because the Court believed instead that this “biased purpose” constituted an element of the crime. Apprendi, 530 US at 495-496. The Court again stated:
“[The Constitution requires that] any fact (other than a prior correction) that increases the maximum penalty for a crime must... be submitted to the jury and proved beyond a reasonable doubt.” [Id. at 476, quoting Jones, 526 US at 243 n 6.]
Accordingly, any fact that “expose [s] the defendant to a greater punishment than that authorized by the jury’s guilty verdict,” constitutes an “element” of the crime *409 that must be presented to the jury and proven beyond a reasonable doubt.[6] Apprendi, 530 US at 494.
After Apprendi, which addressed the constitutional implications of judicially ascertained facts used to increase statutory maximum sentences, the United States Supreme Court addressed the Sixth Amendment implications of judicially ascertained facts used to increase “mandatory minimum” sentences. Harris v United States, 536 US 545; 122 S Ct 2406; 153 L Ed 2d 524 (2002), overruled by Alleyne, 570 US at_; 133 S Ct at 2155. In Harris, the defendant was found guilty of violating various federal drug and firearms laws after he sold illegal narcotics out of his pawnshop while in possession of an unconcealed pistol. Harris, 536 US at 550. One of the statutes under which the defendant was convicted required an increase in the “mandatory minimum” sentence from 5 years to 7 years when the judge determined by a preponderance of the evidence that the defendant had “brandished” a weapon. 18 *410 USC 924(c)(1)(A). Although the defendant’s indictment made no mention of any “brandishing,” the trial court concluded that he had indeed done so and sentenced him to a 7-year mandatory minimum term. Harris, 536 US at 551.
In a plurality opinion, the Supreme Court upheld the defendant’s sentence, concluding that the requirement of “brandishing” constituted a sentencing factor that could be found by the trial court and not an “element” that could be found only by the jury. Id. at 556. The Court also reaffirmed McMillan, holding that it was constitutional for a trial court to find by a preponderance of the evidence facts that increased the minimum punishment as long as the resulting punishment did not exceed the statutory maximum. Id. at 562. The Court opined that “[o]nce the jury finds all those facts, . . . the defendant has been convicted of the crime; the Fifth and Sixth Amendments have been observed; and the Government has been authorized to impose any sentence below the maximum.” Id. at 565.
Two years after Harris, the Supreme Court was presented with a Sixth Amendment challenge to Washington’s “determinate” sentencing guidelines in Blakely v Washington and took it as an opportunity to further clarify the meaning of a “statutory maximum” for purposes of Apprendi,[7] Blakely v Washington, 542 *411 US 296, 298; 124 S Ct 2531; 159 L Ed 2d 403 (2004). In Blakely, the defendant had been convicted of second-degree kidnapping, a Class B felony, and Washington law provided for a maximum sentence of 10 years for this crime. Id. at 298-299. However, Washington’s sentencing reform act provided a specific sentence range for a defendant’s conviction of second-degree kidnapping with a firearm, providing a “standard range” of 49 to 53 months. The act also permitted a court to impose a sentence longer than the standard range if the judge found “substantial and compelling reasons justifying an exceptional sentence.” The trial court departed upward from the standard range by 37 months and sentenced the defendant to 90 months’ imprisonment for the second-degree-kidnapping conviction after finding that he had acted with “deliberate cruelty.” Id. at 300.
The state of Washington contended that its sentencing scheme did not violate Apprendi because the defendant’s relevant “statutory maximum” was not 53 months, but the 10-year maximum for Class B felonies. Id. at 303. The Supreme Court disagreed and by a 5-4 majority concluded that the “statutory maximum” for Apprendi purposes is the maximum sentence a judge may impose “solely on the basis of the facts reflected in the jury verdict or admitted by the defendant,” which for purposes of the second-degree-kidnapping conviction was 53 months. Id. at 304. The Court elaborated:
In other words, the relevant “statutory maximum” is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury’s verdict alone does not allow, the jury has not found all the facts “which the law makes essential to the punishment.” [Id. at 303-304 (citation omitted).]
*412 Thus, the Court noted that the finding of “deliberate cruelty” had to be undertaken by a jury or else admitted by the defendant, and in the absence of these circumstances a sentence based on “deliberate cruelty” would operate in violation of the Sixth Amendment. Id. at 308.
In reaching this decision, the Supreme Court made clear that the Sixth Amendment does not prohibit judicial fact-finding per se, as the Court explicitly stated its approval of systems of “indeterminate” sentencing:
By reversing the judgment below, we are not, as the State would have it, “find[ing] determinate sentencing schemes unconstitutional.” This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment. ...
JUSTICE O’CONNOR argues that, because determinate-sentencing schemes involving judicial fact-finding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury’s traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial fact-finding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal right to a lesser sentence■—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every *413 burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is entitled to no more than a 10-year sentence—and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury. [Id. at 308-309 (citations omitted) (some emphasis added) (alteration in original).]
From this passage, it is apparent that the Supreme Court looked favorably on indeterminate sentencing systems. A majority of the Court did not believe that indeterminate sentencing offended the Sixth Amendment, even if it involved relatively broad exercises in judicial fact-finding, because fact-finding in an indeterminate system does not “pertain to whether the defendant has a legal right to a lesser sentence.” Id. at 309.
Following Blakely, the Supreme Court was faced with a challenge to the “determinate” federal sentencing guidelines in United States v Booker, 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005). In Booker, the defendant challenged the federal guidelines as unconstitutional because they allowed for the enhancement of sentences on the basis of facts determined by the trial court by a preponderance of the evidence. Id. at 226. The Supreme Court agreed and held that the guidelines violated the rule in Apprendi. Just as with the state of Washington’s sentencing system in Blakely, the Court by a 5-4 majority concluded that the federal sentencing system was mandatory, that it imposed binding requirements on sentencing courts, and again as in Blakely, that “ ‘the jury’s verdict alone [did] not sufficiently authorize the sentence. . . . The judge acquire [d] that authority only upon finding some additional fact.’ ” Id. at 235, quoting Blakely, 542 US at 305. The Court elaborated:
*414 If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range.... [W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant. [Booker 543 US at 233.]
However, the determinate federal guidelines were not advisory, but mandatory and binding, and therefore were unconstitutional. Once a trial court ascertained a particular aggravating fact, it was required to increase a defendant’s sentence accordingly and this resulted in a deprivation of the “legal right to a lesser [jury-determined] sentence.” Id.
C. MICHIGAN’S SENTENCING GUIDELINES
After Blakely and Booker were decided, several defendants contended that Michigan’s indeterminate sentencing guidelines violated the Sixth Amendment. Specifically, they argued that the use of judicially ascertained facts to calculate Michigan’s indeterminate sentencing guidelines increases the level of permitted punishments beyond the range authorized by the jury’s verdict and that the Sixth Amendment as interpreted by Blakely is therefore violated. This argument was squarely rejected by this Court in People v Drohan, 475 Mich at 140, 164; 715 NW2d 778 (2006).
To fully understand this Court’s prior analysis regarding Sixth Amendment challenges to our sentencing system, it is necessary to examine how this system *415 operates.[8] It is a sentencing system fundamentally different from the determinate sentencing systems at issue in Apprendi, Blakely, and Booker because in Michigan the great majority of all convicted criminals are given indeterminate sentences.[9] As this Court has pertinently explained:
*416 An indeterminate sentence is one of an unspecified duration, such as one for a term of 10 to 20 years. In other *417 words, while a defendant may serve a sentence of up to 20 years, the defendant may be released from prison at the discretion of the parole board at any time after the defendant serves the ten-year minimum. [Drohan, 475 Mich at 153 n 10 (quotation marks and citations omitted).]
A determinate sentence, on the other hand, is
[a] sentence for a fixed length of time rather than an unspecified duration. Such a sentence can either be for a fixed term from which the trial court cannot deviate ... or can be imposed by the trial court within a certain range. [Id. (quotation marks and citations omitted) (alteration in original).]
Under Michigan’s indeterminate sentencing guidelines, a criminal defendant’s maximum sentence is *418 prescribed by statute, and upon a guilty verdict the defendant is made subject to serving this maximum sentence. Drohan, 475 Mich at 163. That is, the jury’s guilty verdict authorizes punishment of a criminal defendant to the maximum extent allowed by the statute under which he or she has been convicted. At sentencing, the judge’s exercise of judgment is limited solely to selecting a minimum sentence, i.e., a sentence establishing the defendant’s earliest parole eligibility date from within a “recommended minimum sentence range” that is calculated by reference to the defendant’s statutory “prior record variables” and “offense variables.” The range produced is meant to guide the court in selecting a criminal defendant’s minimum parole eligibility date,[10] and it has no effect on the *419 criminal “punishment” imposed on a defendant as a result of the jury’s verdict. MCL 769.34; MCL 791.238.
Once the judge determines the recommended minimum sentence range for a criminal defendant, it may either impose a sentence within that range or choose to depart upward or downward from that range if the judge sets forth on the record “substantial and compelling reasons” justifying that departure. MCL 769.34(3). Once the judge selects a minimum sentence, the defendant must serve that amount of time before he or she can petition the Parole Board for early release, but the defendant has no legal right to be released even a day sooner than the statutory maximum to which he or she has been made subject by the jury’s determination. See Drohan, 475 Mich at 163. As a result, an increase in a defendant’s minimum parole eligibility date does not “expose the defendant to a greater punishment than that authorized by the jury’s verdict[.]” Apprendi, 530 US at 494.
By contrast, in the determinate sentencing systems at issue in Apprendi, Blakely, and Booker, the judge was authorized as a function of the jury’s verdict to impose an ancillary or supplemental sentence by which the judge, and not the jury, ultimately determined a defendant’s exposure to criminal punishment. That is, the judge is charged with deciding how much punishment to impose on a criminal defendant, rather than merely deciding how long the defendant must wait before he or she can petition for early release from the punishment imposed upon him by the jury’s verdict. If the judge imposes punishment in excess of that authorized by the jury’s verdict, the defendant’s Sixth *420 Amendment rights have been violated because judges cannot “expose the defendant to a greater punishment than that authorized by the jury’s verdict[.]” Id.
D. MICHIGAN PRE-ALLEY?®
With this understanding of our state’s sentencing guidelines, this Court has held that the decisions of the United States Supreme Court regarding criminal sentencing in Apprendi, Blakely, and Booker do not apply to Michigan’s indeterminate sentencing system because the authority of the judge never infringes upon the authority of the jury in Michigan.[11] Drohan, 475 Mich at 163. While there are considerable elements of sentencing judgment within our criminal justice system, the paramount authority in setting the maximum exposure to punishment that a criminal defendant faces remains with the jury, and that is what is dispositive under the Sixth Amendment and the Due *421 Process Clause jurisprudence of the United States Supreme Court.
This Court first addressed the various challenges to Michigan’s sentencing system under Apprendi and Blakely (but preceding Booker) in People v Claypool, 470 Mich at 715; 684 NW2d 278 (2004). In that case, we were faced with a challenge regarding a downward departure from the guidelines, and we took the opportunity to opine on Blakely. We noted that Blakely did not affect Michigan’s “indeterminate” sentencing system because the Supreme Court had been clear that its decisions only affected “determinate” sentencing systems, and not “indeterminate” ones. Id. at 730 n 14 (“[T]he majority in [Blakely) made clear that the decision did not affect indeterminate sentencing systems.”). We stated further:
Michigan, in contrast, has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum. The maximum is not determined by the trial judge but is set by law. MCL 769.8. The minimum is based on guidelines ranges as discussed in the present case and in [People v] Babcock [469 Mich 247; 666 NW2d 231 (2003)]. The trial judge sets the minimum but can never exceed the maximum (other than in the case of a habitual offender, which we need not consider because Blakely specifically excludes the fact of a previous conviction from its holding). [Id.]
Because the minimum indeterminate sentence selected by the judge can never exceed the maximum set by law, the “Michigan system is unaffected by the holding in Blakely that was designed to protect the defendant from a higher sentence based on facts not found by the jury in violation of the Sixth Amendment.” Id.
Two terms later, we were faced with a direct challenge to Michigan’s sentencing system in Drohan, 475 *422 Mich at 142-143, in which this Court considered “whether Michigan’s indeterminate sentencing system, which allows a trial court to set a defendant’s minimum sentence on the basis of factors determined by a preponderance of the evidence, violates the Sixth Amendment. . . This Court concluded that it did not, emphasizing that the jury’s verdict authorizes the maximum sentence in Michigan’s indeterminate sentencing system. We further observed that the “Sixth Amendment ensures that a defendant will not be incarcerated for a term longer than that authorized by the jury upon a finding of guilt beyond a reasonable doubt.” Id. at 163. Accordingly, “a defendant does not have a right to anything less than the maximum sentence authorized by the jury’s verdict, and therefore, judges may make certain factual findings to select a specific minimum sentence from within a defined range.” Id. at 159.
[I]n all but a few cases, a sentence imposed in Michigan is an indeterminate sentence. The maximum sentence is not determined by the trial court, but rather is set by law. Michigan’s sentencing guidelines, unlike the Washington guidelines at issue in Blakely, create a range within which the trial court must set the minimum sentence. However, a Michigan trial court may not impose a sentence greater than the statutory maximum. While a trial court may depart from the minimum guideline range on the basis of “substantial and compelling reasons],” MCL 769.34(3); Babcock, [469 Mich] at 256-258, such departures, with one exception, are limited by statute to a minimum sentence that does not exceed “2/3 of the statutory maximum sentence.” MCL 769.34(2)(b). Thus, the trial court’s power to impose a sentence is always derived from the jury’s verdict.... [Id. at 161-162 (emphasis added) (second alteration in original).]
Not only did this Court recognize that a Michigan judge’s exercise of discretion at sentencing is always *423 derived from the jury’s verdict, but it observed that the date chosen by the judge as the "minimum sentence” is merely a parole eligibility date:
[T]here is no guarantee that an incarcerated person will be released from prison after the person has completed his or her minimum sentence. Ultimately, the parole board retains the discretion to keep a person incarcerated up to the maximum sentence authorized by the jury’s verdict. Accordingly, because a Michigan defendant is always subject to serving the maximum sentence provided for in the statute that he or she was found to have violated, that maximum sentence constitutes the “statutory maximum” as set forth in Blakely. Therefore, we reaffirm our statement from Claypool, [470 Mich] at 730 n 14, that “the Michigan system is unaffected by the holding in Blakely that was designed to protect the defendant from a higher sentence based on facts not found by the jury in violation of the Sixth Amendment.” [Id. at 163-164.]
Thus under Drohan, as long as a defendant has received a sentence within the statutory maximum, “a trial court may utilize judicially ascertained facts to fashion a sentence within the range authorized by the jury’s verdict.” Id. at 164.
This position is fully consistent with United States Supreme Court precedent: throughout all of that Court’s decisions addressing the Sixth Amendment implications of judicial fact-finding at sentencing, it has never invalidated an indeterminate sentencing system or found that any indeterminate sentence was imposed in an unconstitutional manner on the basis of Apprendi or Alleyne considerations. Rather, it has expressly noted that indeterminate sentencing does not offend the Sixth Amendment. Blakely, 542 US at 308-309 (noting that in an indeterminate system, judicial fact-finding does not “pertain to whether the de *424 fendant has a legal right to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned”).
Thus both the United States Supreme Court and this Court have recognized that the distinction between indeterminate and determinate sentencing systems is not only consequential, but dispositive, in its Sixth Amendment implications for criminal sentencing. Id. This is because in an indeterminate system a criminal defendant is always subject to the statutory maximum punishment triggered by the jury’s guilty verdict and as a result is restored to his or her “legal right” to freedom from incarceration only upon serving the entirety of that statutory maximum. The judge’s exercise of judgment at sentencing is limited to assigning a minimum parole eligibility date, and even if a defendant is released on the very date he or she becomes eligible for parole, the defendant is still serving the punishment authorized by the jury’s verdict. As a result, the judge’s authority to fashion a minimum parole eligibility date does not affect the punishment imposed on a criminal defendant because it can never “expose the defendant to a greater punishment than that authorized by the jury’s verdict[.]” Apprendi, 530 US at 494.
In sum, Michigan has bifurcated the role of the judge and the jury; the jury is exclusively responsible— consistently with the Sixth Amendment—for determining at what moment a defendant will be fully restored to his or her “legal right” to freedom from incarceration. Once the jury decides that the elements have been proved beyond a reasonable doubt, a defendant is subject to serving the statutory maximum because he or she has no “legal right” to freedom from incarceration any *425 sooner.[12] The Sixth Amendment affords a defendant no more, for it is not a panacea for the correction of all wrongs that some perceive within our sentencing system; recourse for some wrongs must be had through appeals to the people and their representatives in the Legislature. A sentence in Michigan is an indeterminate sentence in all but a few circumstances,[13] and as a result we have correctly held that our sentencing system is compatible with the Sixth Amendment. Drohan, 475 Mich at 143.
E. ALLEYNE
In 2013, the United States Supreme Court was called upon to revisit its holding in Harris, and once again it was faced with the question whether judicially ascertained facts that increase a “mandatory minimum” sentence should be encompassed within the rule of Apprendi. In Alleyne, the Supreme Court was faced with the same statute with which it had been earlier presented in Harris, but now reached a contrary conclusion about the statute’s constitutionality, holding *426 that “any fact that increases the mandatory minimum is an ‘element’ that must be submitted to the jury.” Alleyne, 570 US at_; 133 S Ct at 2155. In reaching this holding, the Supreme Court achieved two things: it overruled Harris and it extended the rule of Ap-prendi to judicially ascertained facts that increase “mandatory minimum” sentences.
Alleyne, like Harris, involved a defendant convicted of using or carrying a firearm while committing a violent crime in violation of 18 USC 924(c). This crime was punishable by a mandatory minimum sentence of five years, but if it was found that a defendant had “brandished” the weapon, the mandatory minimum sentence was to be increased to seven years. Although the jury itself was given the option to find “brandishing,” it did not so find. Id. at_; 133 S Ct at 2156. The judge, however, did find by a preponderance of the evidence that the defendant had “brandished” the weapon and consequently imposed a mandatory seven-year sentence. Id. at_; 133 S Ct at 2156.
The Supreme Court held that such judicial fact-finding violated the Sixth Amendment. Id. at_; 133 S Ct at 2155. The Court extended the rule of Apprendi to facts that increase “mandatory minimum” sentences because “there is no basis in principle or logic to distinguish facts that raise the maximum from those that increase the [mandatory] minimum. . . .” Id. at_; 133 S Ct at 2163.
It is indisputable that a fact triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed... . And because the legally prescribed range is the penalty affixed to the crime, it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense.
*427 It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime. Indeed, criminal statutes have long specified both the floor and ceiling of sentence ranges, which is evidence that both defined the legally prescribed penalty. ... A fact that increases a sentencing floor, thus, forms an essential ingredient of the offense.
Moreover, it is impossible to dispute that facts increasing the legally prescribed floor aggravate the punishment. Elevating the low-end of a sentencing range heightens the loss of liberty associated with the crime: the defendant’s “expected punishment has increased as a result of the narrowed range” and “the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish.” [Id. at_; 133 S Ct at 2160-2161 (citations omitted).]
In reaching this conclusion, the Court was careful to note that its holding did not prohibit “factfinding used to guide judicial discretion in selecting a ‘punishment within the limits fixed by law.’ ” Id. at_n 2; 133 S Ct at 2161 n 2.
Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. See, e.g.,... Apprendi, 530 U.S., at 481 (“[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute”). This position has firm historical roots as well.... Our decision today is wholly consistent with the broad discretion of judges to select a sentence within the range authorized by law. [Id. at_; 133 S Ct at 2163 (citations omitted) (alteration in original).]
The Court noted that the rule of Apprendi applies with equal force to facts that increase mandatory minimum *428 sentences because such judicial fact-finding alters the range of criminal punishment to which a criminal defendant is exposed and thus implicates the constitutional apportionment of authority between judge and jury. Id. at_; 133 S Ct at 2163. In reaching this conclusion, the Court asserted that the Apprendi definition of criminal “elements” necessarily includes facts that increase the floor of the sentence. The Court stated that “[b]oth kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment [in violation of the Sixth Amendment] ,”[14] Id. at_; 133 S Ct at 2158.
F. DEFENDANT’S ARGUMENT
Now that the United States Supreme Court has extended Apprendi to facts that increase “mandatory minimum” sentences, Michigan’s sentencing system is once again challenged as unconstitutional under the Sixth Amendment. Specifically, defendant contends *429 that Alleyne renders Michigan’s indeterminate sentencing guidelines unconstitutional because a criminal defendant’s minimum sentence, i.e., his or her parole eligibility date, is determined in part on the basis of facts not found beyond a reasonable doubt by the jury. Although the majority is persuaded by this argument, I believe it is without merit. Accordingly, I would again sustain the Michigan sentencing guidelines as constitutional.
Initially, it is important to reiterate that Michigan’s guidelines are a product of statute and consequently that this Court has a duty to presume their constitutionality, unless the lack of constitutionality is clearly apparent. Taylor, 468 Mich at 6. In this regard, I would emphasize that, in my view, today’s decision is not compelled by the Sixth Amendment and Due Process Clause decisions of the United States Supreme Court, yet it overturns the specific will of the people of this state by negating their judgments, as reflected by the enactments of their Legislature, that the sentencing system of their state should be characterized by sentencing guidelines of an indeterminate character.[15] Striking down statutes that reflect such a considered judgment of the people and their representatives is something to be done only when the incompatibility of a state law with the federal or state Constitution is *430 manifest and our duty to preserve and maintain these charters of government is therefore directly and necessarily implicated. Phillips v Mirac, Inc, 470 Mich 415, 422; 685 NW2d 174 (2004) (“We exercise the power to declare a law unconstitutional with extreme caution . . . .”)• That is precisely why we presume statutes to be constitutional and why we require a challenging party to demonstrate that a statute’s lack of constitutionality is clearly apparent. Cady v Detroit, 289 Mich 499, 505; 286 NW 805 (1939).
Such a showing, in my judgment, has simply not been made in the present challenge. Defendant’s position effectively seeks to have this Court recognize a new constitutional right to parole eligibility, a right so abstract and tentative that it can only be characterized as a “mere hope” to be released under the Sixth Amendment and the Due Process Clause. Greenholtz v Inmates of Nebraska Penal & Correctional Complex, 442 US 1, 11; 99 S Ct 2100; 60 L Ed 2d 668 (1979). The United States Constitution does not command that this Court recognize such a right, and consequently the will of the people with respect to criminal sentencing should not be overturned in this regard by the Court.[16]
The majority has erred, I believe, for two reasons. First, Michigan’s sentencing system does not offend the Sixth Amendment, for reasons already stated, simply because ours is an “indeterminate” sentencing system. As noted, in Michigan the jury is always required to find the elements of a crime as a prerequisite to the imposition of criminal punishment, and as a *431 result the authority of the judge in sentencing a criminal defendant to a term of incarceration within the limits of the statutory maximum for that crime does not infringe the authority of the jury. See Blakely, 542 US at 308 (“[The Sixth Amendment] limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury”). Second, Michigan’s sentencing system does not offend the Sixth Amendment because the guidelines simply do not produce anything resembling a “mandatory minimum” sentence. Because of this, Alleyne is simply inapplicable and adds nothing of relevance to the Apprendi and Blakely analyses, under which our sentencing system is altogether constitutional.
1. INDETERMINATE SENTENCING AND ALLEYNE
In Drohan, this Court made clear that Michigan’s sentencing system does not offend the Sixth Amendment because it is an “indeterminate” sentencing system in which the authority of the judge cannot infringe upon the authority of the jury. Drohan, 475 Mich at 163. As a result, we held that the rule of Apprendi is inapplicable to Michigan’s sentencing system. Id. Since Drohan, the only thing that has changed is the United States Supreme Court’s issuance of Alleyne, and Al-leyne does not in any way undermine this Court’s holding in Drohan. Because Alleyne merely extended Apprendi to a new realm of criminal sentences that are largely nonexistent in Michigan, our sentencing system remains constitutional for the same reason that we held it to be constitutional in Drohan—it is an indeterminate sentencing system.[17]
*432 A cursory review of Alleyne may lead some to believe that the distinction between indeterminate and determinate sentencing systems is no longer relevant in Sixth Amendment sentencing jurisprudence because the Supreme Court did not expressly refer to such a distinction in Alleyne. However, this overlooks that Alleyne merely extended the rule of Apprendi, a rule that only applies to determinate sentencing systems. Blakely, 542 US at 308-309; Drohan, 475 Mich at 160. As a result, the distinction between indeterminate and determinate sentencing systems remains relevant under the Sixth Amendment because, in a determinate system, the judge’s sentence, and not the jury’s verdict, determines a defendant’s exposure to punishment, while in an indeterminate system, only the jury’s verdict determines the defendant’s exposure to punishment. Furthermore, in an indeterminate system such as Michigan’s, the minimum sentence determined by the judge merely creates a right to a parole hearing—a right that it is not even protected by the Constitution and therefore cannot form the predicate for a Sixth Amendment violation, as the majority believes. See Greenholtz, 442 US at 11.
Thus, the fundamental distinction between indeterminate and determinate sentencing systems remains relevant for Sixth Amendment purposes after Alleyne, and the absence of any express reference to the distinction in that case is neither here nor there. Blakely, 542 US at 308-309. There is simply no compelling reason why the Supreme Court would have thought it necessary in Alleyne to restate a distinction thoroughly *433 addressed in its earlier decisions. The Court had already made it abundantly clear that
the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. [Blakely, 542 US at 308-309 (emphasis added).]
If it had been the intention of Alleyne to alter or undermine an analysis previously set forth in Ap-prendi and Blakely, one would presume that Alleyne would have affirmatively stated its intentions to alter what had been made clear in Apprendi and Blakely concerning the Sixth Amendment significance of indeterminate sentences. There is simply nothing in Al-leyne that logically undermines the Supreme Court’s earlier-stated distinction between determinate and indeterminate sentences, much less anything that so clearly obviates these already-stated distinctions, that silence on the part of the Court should now reasonably be understood as effecting a major change in the constitutional treatment of the sentencing systems of a significant number of states of the Union.[18] There is simply no reasonable understanding of Alleyne that would place a burden on the Court to affirmatively articulate an intention to sustain an existing constitutional rule if that was the Court’s intention, as I believe *434 it to have been. Indeed, exactly the opposite burden would seem to obtain—a burden on the Court to affirmatively articulate its intention to repudiate an existing constitutional rule—before effecting a sea change in the constitutional treatment of state criminal justice practices.
Furthermore, it would make little sense to abandon the distinction between indeterminate and determinate sentencing systems under the Sixth Amendment because the judge in an indeterminate system merely assigns a criminal defendant’s parole eligibility date, which does not implicate the Sixth Amendment. This is why the range in a determinate system is the focus of Apprendi and Alleyne because in those systems, the authority to impose criminal punishment rests with the judge. A judge exercising that power must respect both the top of the range set by the jury’s verdict (Apprendi) and the bottom of the range set by the jury’s verdict {Alleyne). In Michigan’s indeterminate system, however, the jury’s verdict sets a single number—the statutory maximum—and the judge must impose a minimum punishment below the limit set by that number.[19] Although the Legislature mandates that courts be authorized to increase the parole eligibility date, Alleyne, like Apprendi, concerns the authority flowing from the jury’s verdict and not the discretion of *435 a judge.[20] Alleyne makes this clear, as judges are free to find facts as long as it does not alter the range of permissible limits of punishment set by the jury’s verdict. Alleyne, 570 US at_; 133 S Ct at 2163.
By implementing a parole system, our Legislature has given a convicted criminal the opportunity for release before serving his or her statutory maximum. *436 It is important to note, however, that parole is not a constitutionally mandated procedure and rights or interests assertedly stemming from its operations are not generally viewed as being of constitutional dimension. Greenholtz, 442 US at 7 (“There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. ... A state may . . . establish a parole system, but it has no duty to do so.”). To be sure, a delay in the right to a parole hearing might well have considerable effect on the interest of a criminal defendant. Any such interest, however, ultimately reflects a mere hope or aspiration that some personal gain or advantage will result from a hearing, and thus the interest has not been viewed as sufficiently concrete or developed to be entitled to constitutional protection under the Due Process Clause. Id. at 11 (stating that an asserted interest in the possibility of parole is “no more substantial than an inmate’s hope that he will not be transferred to another prison, a hope which is not protected by due process”). While a criminal defendant may understandably view the denial of parole eligibility as part of the “punishment” imposed on him by the court, Michigan law makes clear that this is not the case.[21] MCL 791.238. For that reason, a criminal defendant is not entitled under our Constitution to a jury determination of any fact relied on by a judge to set the defendant’s parole eligibility date because those facts do not “expose the defendant to a *437 greater punishment than that authorized by the jury’s verdict[.]”[22] Apprendi, 530 US at 494.
The United States Supreme Court has held only that an inmate possesses certain due process rights with respect to parole revocation procedures—that is, rights arising after the inmate has been conditionally granted at least some freedom from incarceration. It is only at this time that an individual possesses more than a hope that a benefit will be obtained. Even in this regard, however, there is no right to a jury determination of facts relevant to a decision to revoke good-time credits that have presumably already been obtained by, or conferred upon, an inmate.[23] Finally, the Court has not required a jury at any type of parole proceeding, including a parole-revocation proceeding,[24] and it has not required the parole board itself to apply a “beyond a reasonable doubt” standard to the facts on which it is relying. Greenholtz, 442 US at 14-15.
*438 Furthermore, the Court has never required a jury in a parole proceeding because, although parole proceedings can implicate due process concerns, they do not implicate a defendant’s right to a jury trial under the Sixth Amendment.[25] The Sixth Amendment does not *439 protect a criminal defendant’s hopes or aspirations to be released sooner than he or she is lawfully entitled, nor does it require any fact relevant to a parole proceeding to be proved either by a jury or beyond a reasonable doubt.[26] In Michigan in particular, it is beyond debate that the jury is exclusively responsible for determining at what moment a criminal defendant’s “legal right” to freedom from punishment will be restored.[27] Any judicial authority relating exclusively to selecting a parole eligibility date, and any right arising from the operation of the parole system, implicates rights that are not protected by the Sixth Amendment. As far as the Sixth Amendment is concerned, a criminal defendant in Michigan has been given everything to which the defendant is constitutionally entitled after a jury of his or her peers has returned a *440 verdict and subjected the defendant to serve the statutory maximum punishment. The jury is exclusively responsible for authorizing the limits of criminal punishment, and the judge cannot infringe that power. Thus, the process of scoring prior record and offense variables to set the minimum parole eligibility date constitutes a valid exercise of judicial authority that does not violate or even implicate the Sixth Amendment.
2. “MANDATORY MINIMUM” SENTENCES
Michigan’s sentencing guidelines also fall outside the scope of Alleyne because they simply do not give rise to the “mandatory minimum” sentences that are the focus of that opinion. Again, the critical holding of Alleyne is that any fact that increases the mandatory minimum constitutes an “element” that must be determined by the jury. Alleyne, 570 US at_; 133 S Ct at 2155. By its straightforward terms, Alleyne only pertains to facts that increase “mandatory minimum” sentences.
A “mandatory minimum” sentence is one that requires a sentencing court to impose a statutorily fixed minimum term of incarceration for a particular crime when certain statutory criteria have been satisfied. Concerning these types of sentences, “[t]he offender’s personal background, the facts of his case, and all other details become [otherwise] irrelevant.” Luna, Gridland: An Allegorical Critique of Federal Sentencing, 96 J Crim L & Criminology 25, 66-67 (2005). For example, the defendant in Alleyne was sentenced under a statute with a 5-, 7-, or 10-year “mandatory minimum” sentence, providing as follows:
(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by *441 any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime... for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime-
(i) be sentenced to a term of imprisonment of not less than 5 years',
(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years. [18 USC 924 (emphasis added).]
Michigan does have several genuinely “mandatory minimum” sentences, but we do not have a single statute that operates in the fashion of the statute in Alleyne. See note 13 of this opinion. Of the very few “mandatory minimum” sentences in Michigan, none allows judicial fact-finding to increase the “mandatory minimum” sentence established by the statute and none, of course, is at issue in the present case.
Outside these few statutes, criminal defendants in Michigan are given a minimum sentence as a function of a guidelines calculation of prior record and offense variables, and that minimum sentence represents the earliest time at which a defendant can petition the Parole Board for release. The defendant has no “legal right” to freedom from incarceration before serving the statutory maximum sentence. Drohan, 475 Mich at 163-164; Greenholtz, 442 US at 7 (“There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.”). The guidelines are in place largely to assist the judge in establishing an appropriate parole eligibility date in the individual case. MCL 791.233.
*442 If a criminal defendant in Michigan is charged under a statute that has a “mandatory minimum,” the judge cannot depart below that sentence. MCL 769.34. Because a “mandatory minimum” cannot be departed from, no matter what aggravating or mitigating circumstances may be presented to the court, it is clear that a “mandatory minimum” sentence and a “guidelines minimum” sentence are two very distinct sanctions in our justice system, for the simple reason that one is mandatory and the other is not.[28] Under MCL 769.34, guidelines ranges are formally labeled as “recommended minimum sentence ranges,” not “mandatory minimum” sentences, and “mandatory minimum” sentences are generally referred to as such.[29] Because “recommended minimum sentence ranges” are not the equivalent of “mandatory minimum” sentences in *443 Michigan, judicial fact-finding employed to score the guidelines is permissible under the Sixth Amendment.[30]
Defendant urges this Court to abandon this traditional distinction in light of the United States Supreme Court’s statements in Booker regarding sentencing departures. In Booker, the Court rejected the prosecution’s argument that, because the statute in that case permitted a maximum sentence beyond the guidelines range, the determinate federal guidelines range in dispute did not produce a “statutory maximum” under Apprendi. The Court rejected this argument, stating:
The availability of a departure in specified circumstances does not avoid the constitutional issue, just as it did not in Blakely itself. The Guidelines permit departures from the prescribed sentencing range in cases in which the judge “finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.” 18 U.S.C. § 3553(b)(1) (2000 ed., Supp. IV). At first glance, one might believe that the ability of a district judge to depart from the Guidelines means that she is bound only by the statutory maximum. Were this the case, there would be no Apprendi problem. Importantly, however, departures are not available in every case, and in fact are unavailable in most. In most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible. In those instances, the judge is *444 bound to impose a sentence within the Guidelines range. [Booker, 543 US at 284 (emphasis added).]
It is argued here that this language, coupled with Alley ne, renders the Michigan guidelines unconstitutional. I do not agree.
First of all, anything the Supreme Court has said about upward departures in a determinate system cannot reflexively be applied to an indeterminate system. A departure in a determinate system can result in a criminal defendant being deprived of his or her “legal right to a lesser sentence.” This is because the judge ultimately has the authority to choose at what moment this “legal right” to freedom from incarceration will be restored, and if the judge chooses a date beyond that authorized by the jury’s verdict, the defendant is necessarily deprived of his or her legal right to a maximum sentence determined by the jury’s verdict.[31] This is not true in an indeterminate system because the judge in such a system does not have the authority to determine at what moment a defendant’s “legal right” to freedom from incarceration will be restored, nor does the judge have any authority to extend the minimum parole eligibility date beyond the statutory maximum sentence.
Second, this same argument was made in Drohan regarding the “statutory maximum” under Blakely and *445 Apprendi, and this Court rejected it on the grounds that our system is indeterminate and thus distinct from those at issue in Apprendi and Blakely. Drohan, 475 Mich at 163-164. If the above passage from Booker was not read at that time to render our guidelines unconstitutional under Apprendi, it surely cannot now be read to render our system unconstitutional under Alley ne, as, Alley ne merely extended Apprendi to a new category of sentences into which the instant sentence does not fall. Reliance on Booker in the instant case is misplaced for the identical reasons that this Court has already explained in Drohan:
Defendant asserts that the “maximum-minimum” under the guidelines constitutes the “statutory maximum” for Blakely purposes because a trial court is required to depart on the basis of a finding of aggravating factors that, as a practical matter, will subject the defendant to an increase in the actual time the defendant will be required to serve in prison. However, defendant’s interpretation is inconsistent with the nature of the protection afforded by the Sixth Amendment. At common law, a jury’s verdict entitled a defendant to a determinate sentence. During the 19th century, American courts began moving away from such sentencing hy according trial courts the discretion to determine a defendant’s sentence. However, this new discretion was limited by fixed statutory or constitutional limits. In other words, while a trial court could impose a sentence less than the maximum authorized by the jury’s verdict, the court could not impose a sentence greater than that allowed by the statute that the defendant had been convicted of violating. In short, the Sixth Amendment ensures that a defendant will not be incarcerated for a term longer than that authorized by the jury upon a finding of guilt beyond a reasonable doubt. However, the Sixth Amendment does not entitle a defendant to a sentence below that statutory maximum. Rather, under the Sixth Amendment, the jury effectively sets the outer limits of a sentence and the trial court is then permitted “to exercise discretion—taking into consideration various *446 factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute.”
When defendant, a third-offense habitual offender, committed third-degree criminal sexual conduct, he did so knowing that he was risking 30 years in prison. When defendant was, in fact, sentenced to a maximum of 30 years in prison, he received all the protections he was entitled to under the Sixth Amendment. Therefore, the trial court’s exercise of discretion in imposing a sentence greater than the “maximum-minimum,” but within the range authorized by the verdict, fully complies with the Sixth Amendment. [Drohan, 475 Mich at 162-163 (citations omitted).]
For each of these reasons, it seems clear that Michigan’s sentencing guidelines do not produce “mandatory minimum” sentences and therefore are unaffected by Alleyne.
It may also be relevant to note that I am not alone in reaching this conclusion. Each of the 11 federal courts of appeals to rule on this issue has held that judicial fact-finding does not implicate Alleyne if there is no “mandatory minimum” sentence involved.[32]And *447 in each of these cases, the court has found Alleyne *448 inapplicable when judicial fact-finding is merely used to score guidelines and does not result in an increased “mandatory minimum” sentence. Although the courts of appeals have sometimes overturned sentences under Alleyne, on each occasion it was done because the statute under which the defendant was convicted allowed judicially ascertained facts to justify an increase in the statutory “mandatory minimum,” as in Alleyne itself.[33] No court of appeals has held Alleyne to be applicable to judicial fact-finding used to score guidelines.
In summary, the trial court in the instant case did not violate the Sixth Amendment by scoring defendant’s offense variables under a “preponderance of the evidence” standard. As Alleyne made clear:
Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment. [Alleyne, 570 US at_; 133 S Ct at 2163.]
Because a Michigan trial court’s exercise of judgment at sentencing falls within the “broad sentencing discretion, informed by judicial fact-finding,” defendant here is not entitled to be resentenced because his sentence fully comported with the requirements of the Sixth Amendment.
*449 IV. RESPONSE TO THE MAJORITY
The majority believes that Alleyne altered the Sixth Amendment landscape established by Apprendi by holding merely that the “Apprendi rule applied with equal force to minimum sentences.” Michigan’s sentencing guidelines thereby fail under Apprendi because the “guidelines used to set the minimum sentence require a court to increase a defendant’s minimum sentence beyond the minimum sentence authorized by the jury’s verdict alone.” As a result, “under Alleyne, the Legislature may not require judicial fact-finding that results in a mandatory increase in either the minimum or maximum sentence beyond the range set by the jury verdict.” This is because the right to a jury trial includes “the right to have a ‘jury determination’ of all the pertinent facts used in increasing the prescribed range of penalties”
Although I agree that trial judges in our state find facts that increase a prescribed range and do so in a manner that can be considered “mandatory,” this cannot be the end of the analysis. Alleyne indeed extended the rule of Apprendi to mandatory minimum sentences, and thus we must apply that rule to our sentencing system to determine whether the judge is finding “elements” that must be found by the jury and found beyond a reasonable doubt. The majority, however, does not actually apply Apprendi to our sentencing system, and it does not actually explain why an increase in the guidelines range somehow increases the “punishment” imposed on a criminal defendant. By simply assuming that Apprendi applies to our system because it is “mandatory,” and then by further assuming that an extension of the period before a defendant first becomes eligible for parole is tantamount to an *450 increase in “punishment,” the majority errs, in my view, by concluding that our sentencing system is unconstitutional.
The instant case involves the right to a jury trial, and this right is the product of both the Sixth Amendment and the Due Process Clause. Whether our sentencing system is constitutional cannot be answered by this Court exclusively on the basis of the text of these provisions. Rather, we must rely on the analyses set forth in two lines of United States Supreme Court decisions: the first is the line of cases including Ap-prendi and its progeny and the second is the line of cases encompassing the Court’s analysis of the constitutional implications of parole under the Due Process Clause. This scope of analysis should not come as a surprise in light of the explicit recognition in Apprendi and Alleyne that the Alleyne rule is a function of both the Sixth Amendment and the Due Process Clause.[34]
The majority finds inapplicable the latter line of cases because they do not also involve the Sixth Amendment. See note 25 of this opinion. This holding cuts directly against the Supreme Court’s Due Process precedents, for if an increase in a defendant’s minimum parole eligibility date constitutes an increase in “punishment,” so too does a denial of parole by the Parole Board. Criminal defendants as a result of to *451 day’s decision will soon be proceeding en masse to challenge any denial or delay of parole as a violation of their “Lockridge” rights, and when they do, the majority will again have to decide whether Supreme Court decisions such as Greenholtz[35] and Morrissey[36] are relevant in ruling on those appeals. Only then will it become apparent how critical these decisions are, not only for the Lockridge cases of tomorrow, but also for the Lockridge case that is before us today. The majority has dismissed Greenholtz and Morrissey in today’s case, but they will not be able to dismiss them tomorrow when today’s decision must be given application in the context of countless individual appeals.
In the Supreme Court’s Due Process Clause jurisprudence, there is a line of cases addressing constitutional rights associated with parole and parole eligibility. Because judges in Michigan, in implementing our sentencing guidelines, bear the responsibility of setting a defendant’s earliest parole eligibility date, it is obvious that this line of Supreme Court cases would not only not be instructive in applying the rule of Apprendi, but would be particularly instructive for this purpose. This is because a judge’s extension of the period before a defendant first becomes eligible for parole is the equivalent of a parole board’s finding facts that operate to deny parole.[37] If the Supreme Court believed that a parole-eligibility determination by the trial judge constituted an increase in a defendant’s “punishment,” the Court would also have required facts relied on by a parole board to make this same determination to be found instead by a jury. This is *452 emphatically not the case, however, because the Supreme Court has held that a person has no due process rights with respect to parole eligibility, and it has rejected the argument that a parole board must empanel a jury to determine whether to grant or deny parole. Greenholtz, 442 US at 11; Morrissey, 408 US at 489. From these holdings, it is apparent that the Court does not view decisions concerning a defendant’s parole eligibility as tantamount to an increase in “punishment.”
From the defendant’s perspective, we may be able to understand this distinctive sense of “punishment” served while incarcerated and “punishment” served while on parole. But the relevant perspective for this Court is not that of the defendant but that of the Constitution, and the Supreme Court has made clear that under the Constitution, a defendant has no right to parole and serves his or her “punishment” both while in prison and while on parole. Greenholtz, 442 US at 11. Because a defendant might well prefer to spend a part of his or her overall punishment on parole rather than in prison does not mean that a judicial increase in the period before the defendant becomes eligible to serve that punishment on parole constitutes an increase in the “punishment” authorized by the jury’s verdict. The Supreme Court has never treated the denial or delay in parole eligibility as the equivalent of an increase in punishment, and the majority’s conclusion that judicial fact-finding increases the defendant’s exposure to criminal punishment can only be reached by disregarding the United States Supreme Court’s line of Due Process Clause cases.
If the majority is correct and judges in our system are finding facts “essential to the punishment” by finding facts that extend the period before a defendant *453 becomes eligible for parole, then it must in the interests of consistency also resolve that facts found by a parole board that operate to deny parole are facts “essential to the punishment” and must therefore also be ascertained by a jury. Yet the Supreme Court has made clear that this is not the case. Greenholtz, 442 US at 11. Indeed, not only has the Court never required a jury to find facts relevant to the denial of parole in that context, but it has stated that those facts may be found by members of the parole board, who are neither jurors nor judges. Morrissey, 408 US at 489.
Parole is a mere “permit” to serve a part of one’s criminal sentence outside prison. MCL 791.238. Just as a criminal defendant might prefer to spend the part of his or her punishment served in prison in minimum security rather than maximum security, and just as the defendant might have 1,001 other preferences and objections concerning the environment within which the prison part of that punishment is served, he or she might also prefer to spend a part of that punishment on parole. But again, the preference and perspective of the defendant is not what determines what is “punishment.” Both Michigan law and precedent and United States Supreme Court precedent clearly answer the dispositive question whether a judge in our state increases a defendant’s “punishment” when he or she finds facts that operate to delay parole eligibility. Yet the majority strikes down Michigan’s sentencing system on the basis of a contrary answer to this same question.
The majority declares that Alleyne has altered the legal landscape to the extent that our sentencing scheme is now unconstitutional under Apprendi, but the only part of that landscape that has changed is that Apprendi now applies to both maximum and manda *454 tory minimum sentences. Yet the landscape constructed by Apprendi, which Alleyne did nothing to alter, only applied to determinate sentencing systems.[38] As a result, the majority has applied in error a constitutional rule that was inapplicable in the first place. Under Apprendi, a fact must be submitted to the jury only if it increases the punishment. In Michigan, however, the process of scoring offense variables to compute a minimum parole eligibility date does not increase the punishment to which a defendant is exposed. Once a jury finds a defendant guilty, the jury has at that point authorized criminal punishment up to the statutory maximum and the judge has no ability to sentence beyond that limit. Thus, the judge can alter only the parole eligibility date, which, as explained, bears no constitutional significance, whatever the obvious differences in character between incarceration and parole.
In other words, Michigan’s system is virtually identical to the common-law system that Justice Thomas, in a part of his opinion joined only by Justices Ginsburg, Sotomayor, and Kagan, described approvingly in Alleyne:
At common law, the relationship between crime and punishment was clear. As discussed in Apprendi, “[t]he substantive criminal law tended to be sanction-specific,” meaning “it prescribed a particular sentence for each *455 offense.” The system left judges with little sentencing discretion: once the facts of the offense were determined by the jury, the “judge was meant simply to impose [the prescribed] sentence.” [Alleyne, 570 US at _; 133 S Ct at 2158 (citations omitted) (alterations in original).]
In Michigan, our criminal law is also “sanction-specific,” meaning that it prescribes a particular sentence for each offense. The jury finds the facts relevant to the imposition of criminal punishment, and once the facts of the offense are determined by the jury, the judge simply imposes the prescribed sentence.[39]
The plurality part of Alleyne then proceeded to recognize the transition from the common law toward determinate sentencing systems in which general facts found by the jury produce a range of permissible sentences and particular and more specific facts, if also found by the jury, increase this range:
While some early American statutes provided ranges of permissible sentences, K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998), the ranges themselves were linked to particular facts constituting the elements of the crime. E.g., Lacy v. State, 15 Wis. 13 (1862) (discussing arson statute that provided for a sentence of 7 to 14 years where the house was occupied at the time of the offense, but a sentence of 3 to 10 if it was not); Ga. Penal Code §§4324-4325 (1867) (robbery “by open force or violence” was punishable by 4 to 20 years’ imprisonment, while “[r]obbery by intimidation, or without *456 using force and violence,” was punishable by 2 to 5 years’ imprisonment). This linkage of facts with particular sentence ranges (defined by both the minimum and the maximum) reflects the intimate connection between crime and punishment. [Id. at_; 133 S Ct at 2158.]
This passage specifically describes the type of system that both Alleyne and Apprendi restrict because the jury no longer authorizes a specific sentence in these systems; rather, it authorizes a sentence range. Because the jury’s verdict authorizes a range instead of a fixed punishment, judicial alteration of this range is no different from judicial alteration of the fixed common-law sentence that was authorized by the jury’s verdict.
For example, in a statutory scheme in which arson is punishable by imprisonment for 7 to 14 years when a residence is occupied at the time of the offense, but a sentence of 3 to 10 years if it is not, it is for the jury to decide which offense the defendant committed. If the jury decides that the house was not occupied, it limits the court’s authority to sentence the defendant to a range of 3 to 10 years, and the judge cannot find to the contrary that the house was occupied and then alter the range to 7 to 14 years. To do so would be to find a fact “essential to the punishment sought to be inflicted.” The judge would improperly be impinging on the jury’s authority in regard to criminal punishments. Michigan’s sentencing system does not allow the jury to authorize a range of permissible sentences, and thus our system is identical to the common-law system for purposes of the present constitutional analysis. In our system, arson of a dwelling is punishable by imprisonment for up to 20 years, MCL 750.73, but arson of a structure that is not a dwelling is only punishable by up to 10 years, MCL 750.74. When the jury returns a verdict finding the defendant guilty of arson of a building that is not a dwelling, the judge cannot find *457 that the building was a dwelling and increase the punishment associated with the crime from 10 to 20 years. If the judge were to do this, it would be equivalent to an increase in the sentence range from 3 to 10 years to 7 to 14 years under the previous example. This would violate the defendant’s right to a jury trial because the court would by itself have expanded the defendant’s maximum exposure to punishment. That is, the judge would be finding facts “essential to the punishment sought to be inflicted” and the power to find those facts reposes exclusively within the domain of juries. See Apprendi, 530 US at 510; Alleyne, 570 US at_; 133 S Ct at 2158-2159.
However, it does not violate the defendant’s right to a jury trial when the trial court imposes the precise punishment the jury has authorized because the Sixth Amendment concerns the authority of the jury. Blakely, 542 US at 308-309. If the judge cannot interfere with the authority of the jury to impose criminal punishment, there can be no Sixth Amendment violation. Id. It truly is as simple as that, as “the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury.” Id. Any discretion our judges possess at sentencing cannot be exercised at the “expense of the jury’s traditional function of finding the facts essential to lawful imposition of the penalty.” Id. at 309. As a result, our system does not violate, or even implicate, the Sixth Amendment. The majority, I respectfully believe, errs by holding otherwise.
V. IRONY
For the reasons set forth in this opinion, I disagree with the analysis of the majority. However, this dis *458 agreement is largely confined to the majority’s analysis of what the United States Supreme Court has said is required by the Sixth Amendment of the Constitution. The majority’s having reached the conclusion it does—that Michigan’s sentencing system is unconstitutional—I cannot fairly hold the majority responsible for the public policy consequences of what it believes to be constitutionally required. If Michigan’s sentencing system indeed violates the Sixth Amendment, it cannot be maintained and an alternative sentencing system must be established in its place. Nonetheless, in reflecting upon the very substantial practical consequences of today’s decision for our state’s criminal justice process, I cannot help but view the new reality that has been created by this Court as deeply marked by irony. And such irony does, to my mind, cast further doubt about whether the majority’s interpretations of the United States Supreme Court’s decisions in Ap-prendi and Alleyne are correct. How can there be such a great disparity between the expressed concerns and purposes of the Supreme Court in these decisions and their real-world effect in Michigan? How can there be such a “disconnect” between the constitutional impulses apparently underlying these decisions and the specific dislocations they will cause to our state’s criminal justice process?
First, it is ironic that two decisions of the United States Supreme Court intended to limit what that Court viewed as the encroaching power of the judiciary on the authority of the jury would lead to an expansion of the power of the former and a diminution in the authority of the latter. Rather than being constrained by a relatively narrow guidelines range that, for example, requires a defendant to be sentenced to a term of 8 to 10 years and allows the court to depart upward or downward from that range only upon a showing of *459 “substantial and compelling circumstances,” today’s decision empowers the court to sentence that same defendant to any term between zero years and the statutory maximum with almost no meaningful appellate review. Not only does this result in a substantial broadening of the power of judges, but it also results in a substantial diminishing of the authority of juries. While the jury will continue to determine what statutory maximum applies, its decision will no longer determine the choice of the earliest parole date applicable to the conviction offense. From the perspective of a majority that views this parole date as defining a “punishment,” this constitutes a considerable curtailment in the breadth of the jury’s constitutional authority to authorize the terms of punishment, and from the perspective of this dissent, it constitutes a considerable curtailment in the breadth of the jury’s statutory authority to determine the penal consequences of criminal misconduct.
Second, it is ironic that two decisions of the United States Supreme Court designed to foster predictability and certainty in criminal sentencing, see Alleyne, 570 US at _; 133 S Ct at 2161 (“Defining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment.”); Apprendi, 530 US at 478-479, would lead to a criminal justice process in which there will be considerably less predictability and certainty. This is the result of the nullification of a sentencing guidelines system designed to achieve exactly the kind of predictability referred to in those decisions and its replacement by a system of broad judicial discretion that makes it almost impossible for a defendant, or a prosecutor, to predict with reasonable certainty what sentences will be imposed. Instead, the only thing that *460 is now “predictable” is that the practical consequences for an intelligent plea-bargaining process are likely to be considerable.
Third, it is ironic that two decisions of the United States Supreme Court intended to protect defendants’ rights would lead to an erosion of one of the most important protections afforded defendants by our state’s criminal justice system. The Sixth Amendment and Due Process Clause guarantee criminal defendants the right to a jury trial precisely in order to protect them from the abuse of state power. Duncan, 391 US at 155. However, in the place of a sentencing system that has effectively limited the potential abuse of state power by sharply curtailing the exercise of discretion by judges in determining specific criminal sentences, defendants will now be relegated to a system in which they face nearly unfettered exercises of discretion by judges. A step has been taken backward from the equal rule of the law and toward the discretionary rule of the judge.
Fourth, it is ironic that two decisions of the United States Supreme Court designed to preserve the authority of that most republican of American constitutional institutions, the jury, would lead to an expansion in the power of that least republican of American constitutional institutions, the judge. This expansion of judicial power comes at the direct expense of the people and their representatives, whose contrary judgments in setting binding sentencing guidelines have been overturned. Sentences thus will become more a function of the personal attitudes and viewpoints of 586 judges and less a function of the perspectives of the citizenry as a whole.
Fifth, it is ironic that two decisions of the United States Supreme Court premised on a defendant’s right *461 to fairness in the sentencing process, grounded in the Sixth Amendment and Due Process Clauses of the Constitution, would lead to the nullification of guidelines predicated on this identical premise. Our Legislature established the sentencing guidelines “intending to reduce unjustified disparities at sentencing.” People v Babcock, 469 Mich 247, 267 n 21; 666 NW2d 231 (2003). The guidelines were intended to produce a system in which similarly situated defendants would be sentenced in a reasonably similar manner, rather than having one defendant sentenced by Judge Maximum Mike to a 12-year term and another defendant sentenced by Judge Lenient Larry to a 4-year term. This pursuit of sentencing uniformity and consistency as the lodestar of our justice system has now given way to a rule of deference to the widely disparate judgments of 586 judges.
Sixth, it is ironic that although the majority holds that under Alleyne the minimum end of sentence ranges under our sentencing guidelines impermissibly infringes the jury’s authority, the majority has chosen to apply the exceedingly broad remedy of Apprendi and Booker—cases involving the maximum end of sentencing guidelines—that operate to diminish the authority of the jury rather than enhance it. In Booker, the Supreme Court in support of its Apprendi analysis implemented a remedy rendering the guidelines advisory in an effort to protect the authority of the jury in setting a defendant’s maximum exposure to punishment. Then, in Alleyne, the Supreme Court implemented a narrow remedy and held that facts increasing the minimum sentence must be submitted to the jury in order to protect the jury’s authority with respect to a defendant’s minimum exposure to punishment. This Court has already recognized in Drohan that the constitutional deficiency relating to the maxi *462 mum sentence does not exist within our system (and the majority does not question this), and as a result the remedy of Booker is inapt. Now, the majority holds that there is a constitutional deficiency relating to the minimum sentence, and apparently only the minimum sentence, yet instead of adopting the narrow remedy of Alleyne, the majority adopts the exceedingly broad remedy of Apprendi and Booker. By applying this remedy designed to cure a different constitutional deficiency than is identified in the present case, the majority renders the jury irrelevant in determining the minimum sentence while again significantly expanding the power of the judge. The majority adopts without consideration of alternatives an exceedingly broad remedy that might be appropriate for an Apprendi/Booker violation, but is far less appropriate for an Alleyne violation, for which the Supreme Court has crafted a specifically tailored and considerably narrower and more focused remedy.[40]
*463 VI. CONCLUSION
I conclude that under the Sixth Amendment a crim *464 inal defendant is not entitled to a jury determination of facts necessary to establish his or her minimum parole eligibility date. Under Michigan’s sentencing system, the jury has the authority to render a defendant subject to the statutory maximum punishment, and the judge has no influence over this authority or any authority to usurp it. The judge’s exercise of judgment in establishing a parole eligibility date does not in *465 fringe the authority of the jury and does not violate the Sixth Amendment of the United States Constitution. Furthermore, Michigan’s indeterminate sentencing guidelines do not produce “mandatory minimum” criminal sentences, and because Alleyne only applies to facts that increase “mandatory minimum” sentences, Alleyne is inapplicable to our state’s guidelines. Therefore, I conclude that Michigan’s sentencing system does not offend the Sixth Amendment and would therefore affirm the judgment of the Court of Appeals.
ZAHRA, J., concurred with MARKMAN, J.

 “The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; Or if there is any difference between them it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.” Federalist, No. 83 (Alexander Hamilton) (Cooke ed, 1961), p 562.

 Justice Joseph Story wrote that this constitutional guarantee was “generally understood to mean... a trial by a jury of twelve men, impartially selected, who must unanimously concur in the guilt of the accused before a legal conviction can be had.” 2 Story, Commentaries on the Constitution of the United States (4th ed) (Boston: Little, Brown & Company, 1873), p 541 n 2.

 It is important at the outset to understand that the Sixth Amendment right to a jury trial cannot be fully understood in isolation from the Due Process Clause of the Fifth and Fourteenth Amendments because it is only in conjunction that “these rights indisputably entitle a criminal defendant to ‘a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.’ ” Apprendi v New Jersey, 530 US 466, 476; 120 S Ct 2348; 147 L Ed 2d 435 (2000), citing Gaudin, 515 US at 510. This is because the Sixth Amendment guarantees a criminal defendant “the right to have the jury, rather than the judge, reach the requisite finding of ‘guilty,’ ” and the Due Process Clause requires the government to prove each and every element of a crime “beyond a reasonable doubt.” Sullivan v Louisiana, 508 US 275, 277; 113 S Ct 2078; 124 L Ed 2d 182 (1993); see also Patterson v New York, 432 US 197, 210; 97 S Ct 2319; 53 L Ed 2d 281 (1977); In re Winship, 397 US 358, 368; 90 S Ct 1068; 25 L Ed 2d 368 (1970). Accordingly, it is the combination of these rights that gives rise to the constitutional right that is the subject of the instant case.

 At the same time, the Supreme Court has held that mere “sentencing factors” may be ascertained by a judge using a preponderance of the evidence standard, as these factors are not subject to the Constitution’s indictment, jury, and proof requirements. Jones v United States, 526 US 227, 232; 119 S Ct 1215; 143 L Ed 2d 311 (1999) (“Much turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt.”).

 Although I describe this right throughout as a “legal” right, it would be equally accurate to describe it as a “constitutional” right. I characterize it as the former only to render our description consistent with that in Blakely Washington, 542 US 296, 309; 124 S Ct 2531; 159 L Ed 2d 403 (2004), in which it was asserted that the Sixth Amendment prohibits a judge from depriving a criminal defendant of his or her “legal right to a lesser sentence.” The specific “legal right” that is the subject of this opinion is variously described, as the context requires, as “the legal right to a sentence not to exceed that determined by the jury”; “the legal right to a lesser sentence”; “the legal right to freedom from incarceration”; and “the legal right to freedom from incarceration after having served the maximum sentence.” Each of these is intended generally to describe the Sixth Amendment right identified in the Supreme Court decisions of Apprendi and Alleyne.

 Justice O’Connor wrote for four justices in dissent in Apprendi. In her view, the majority had crafted a new constitutional rule that was “unsupported by the history and case law it cites” and this fact alone is “reason enough to reject such a substantial departure from our settled jurisprudence.” Apprendi, 530 US at 539 (O’Connor, J., dissenting). She also characterized the majority’s opinion as “a watershed change in constitutional law,” and went on to note that the majority “casts aside our traditional cautious approach and instead embraces a universal and seemingly bright-line rule limiting the power of Congress and state legislatures to define criminal offenses and the sentences that follow from convictions thereunder.” Id. at 525. Justice Breyer also wrote in dissent on behalf of himself and Chief Justice Rehnquist, noting that the
real world of criminal justice cannot hope to meet any such ideal [as that adopted by the majority]. It can function only with the help of procedural compromises, particularly in respect to sentencing. And those compromises, which are themselves necessary for the fair functioning of the criminal justice system, preclude implementation of the procedural model that today’s decision reflects. [Id. at 555 (Breyer, J., dissenting).]

 A determinate sentence is a sentence “of a specified duration.” Black’s Law Dictionary (10th ed), p 1569. This is in contrast to an “indeterminate” sentence, which is a sentence “of an unspecified duration, such as one for a term of 10 to 20 years.” Id. at 1570. Thus, a determinate system is a sentencing system in which the defendant receives a certain and fixed sentence and is subject to serving that precise sentence. An indeterminate system is a sentencing system in which the defendant receives a singular maximum sentence, and, in some systems such as Michigan’s, may be released on parole before serving that maximum.

 Michigan initially had a purely indeterminate sentencing system, in which the judge possessed unfettered judgment to sentence a defendant anywhere between no jail time and imprisonment in the amount of the statutory maximum. Over time, this Court came to disfavor the sentencing disparities that resulted from this type of unrestricted judgment. To narrow these disparities, this Court enacted judicial sentencing guidelines in 1984 by administrative order. Administrative Order No. 1984-1, 418 Mich lxxx (1984); Administrative Order No. 1985-2, 420 Mich lxii (1985). Under these judicial guidelines, a recommended minimum sentence range was produced by scoring a defendant’s prior record variables and offense variables; once a recommended minimum sentence range was calculated in this manner, the judge could only depart outside this range if he or she articulated specific reasons for the departure on the record. People v Broden, 428 Mich 343, 352; 408 NW2d 789 (1987). A second edition of the judicial guidelines was issued in 1988, and application of these modified guidelines was required for certain offenses, although the actual imposition of minimum sentences within the guidelines ranges themselves was not also required. Michigan Sentencing Guidelines (2d ed) (1988), p 7. The purpose of the guidelines was to provide sentencing norms, to promote judicial consistency, and to minimize sentencing disparities without altogether eliminating the court’s exercise of judgment. People v Coles, 417 Mich 523; 339 NW2d 440 (1983). The citizens of this state were apparently still dissatisfied with remaining sentencing disparities, and the Legislature enacted the statutory guidelines in 1998. Similarly to the judicial guidelines, the statutory guidelines structured and constrained the exercise of judgment by the trial court without entirely eliminating it. Unlike the judicial guidelines, however, the statutory guidelines generally required trial courts to sentence within the guidelines, and they could not depart from the prescribed range without stating “substantial and compelling” reasons for the specific departure on the record. MCL 769.34(3).

 The majority agrees that the rules of Apprendi and Alleyne do not apply to “indeterminate” sentencing schemes, yet it applies these rules to Michigan’s indeterminate sentencing system. To justify this application, the majority holds that “Michigan’s sentencing scheme is not ‘indeterminate’ as that term has been used by the United States Supreme Court[.]” *416 lb hold thusly, the majority relies on the dissent of Justice O’Connor in Blakely and two law review articles. These sources suggest that the Supreme Court’s genuine intention in referring to “indeterminate” sentencing was to discuss indeterminate sentencing systems in which there is an “absence of mandatory constraints placed on a court’s discretion when sentencing a defendant,” and because Michigan has mandatory constraints, ours is not an “indeterminate” system in the way that term is used by the United States Supreme Court. I disagree. Michigan has an “indeterminate” sentencing system in which the jury finds all facts necessary for the imposition of punishment, Const 1963, art 4, § 45; Drohan, 475 Mich at 163, and consequently the rule of Apprendi is inapplicable. The majority’s is an invented distinction that Apprendi is applicable only to some asserted subcategory of “indeterminate” sentencing systems—a subcategory whose very obviousness one might have thought would have compelled a more nuanced analysis by the Court had it genuinely intended some number of “indeterminate” systems to be treated distinctively from other “indeterminate” systems'—and is therefore a distinction that should hardly serve as a basis for upending the entire sentencing system of our state on the grounds of a supposed lack of constitutionality. In Blakely, the United States Supreme Court spoke in general terms concerning indeterminate sentencing systems and held that “indeterminate” systems do not offend the Sixth Amendment. Blakely, 542 US at 308-309. Any assertion that the Court intended something different and more nuanced is entirely speculative, as evidenced by the fact that the majority cites no source of binding authority to support its conclusion in the face of inhospitably explicit statements by the Court.
Furthermore, the majority’s artificial distinction between types of indeterminate systems holds little weight when one examines the specific statements the United States Supreme Court has made regarding indeterminate sentencing. The Court stated, for example, in Blakely:
[T]he Sixth Amendment by its terms is ... a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury’s traditional function of finding facts essential to lawful imposition of the penalty. [Id. (emphasis added).]
Under either subcategory of indeterminate sentencing identified by the majority, any judicial discretion at sentencing is not at the “expense of the jury’s traditional function of finding facts essential to the lawful *417 imposition of the penalty.” Rather, the jury is responsible for finding all facts essential to authorize the statutory maximum penalty. Whether the Legislature chooses to allow judicial discretion with respect to the selection of a parole eligibility date after the jury has exercised this authority is irrelevant. In noting that indeterminate sentencing schemes do not offend the Sixth Amendment, the United States Supreme Court focused only on whether the judicial power infringes the jury’s authority to find facts essential to authorize the maximum penalty. The extent of judicial discretion after the jury finds those facts is never mentioned by the Court. It is clear that the Court in Blakely was referring generally to indeterminate sentencing as it showed no concern with the amount of discretion given to courts as long as that discretion did not enable the judge to interfere with the prerogative of the jury. There is thus no indication that the Court referred to indeterminate sentencing in either a casual or imprecise manner.
As for the majority’s reliance on Justice O’Connor’s Blakely dissent, she asserted that as a result oí Blakely all sentencing schemes that have guidelines might be constitutionally suspect. Yet at the same time, she stated that Blakely is “not a constitutional prohibition on guideline schemes,” Blakely, 542 US at 318, and nowhere asserted that the Michigan system is a “determinate system.” Further, this Court has also exercised its own constitutional judgment post -Blakely as the court most familiar with Michigan’s sentencing system and held that it does not violate the Sixth Amendment. Drohan, 475 Mich at 164. Apparently, the United States Supreme Court did not believe this conclusion to be in error. Drohan v Michigan, 549 US 1037 (2006) (denying certiorari).

 Take the instant defendant, for example. He was found guilty of committing involuntary manslaughter, which is a “crime against a person,” MCL 777.16p, and MCL 777.21(1)(a) and MCL 777.22(1) require the court to score Offense Variables 1, 2, 3, 4, 7, 8, 9, 10, 11, 12, 13, 14, 19 and 20 for this type of crime. At sentencing, the trial court assessed 25 points for Offense Variable 3 (physical injury to victim) under MCL 777.33(l)(c). Because a homicide was involved, the trial court also assessed 15 points for Offense Variable 5 (psychological injury to member of victim’s family) under MCL 777.35(1)(a) and 10 points for Offense Variable 6 (intent to kill or injure another individual) under MCL 777.36(1)(c). The court assessed 10 points for Offense Variable 9 (number of victims) under MCL 777.39(1)(c) and 10 points for Offense Variable 10 (exploitation of a vulnerable victim) under MCL 777.40(l)(b). This amounted to a total of 70 offense variable points. In addition to this determination, defendant had several prior criminal convictions, which led to the scoring of additional points. The court assigned 25 points under MCL 777.51(l)(c) for Prior Record Variable 1 for having one prior high severity felony conviction, 5 points under MCL 777.55(l)(d) for Prior Record Variable 5 for having two prior misdemeanor convictions or prior misdemeanor juvenile adjudications, and 5 points under MCL 777.56(l)(d) for Prior Record Variable 6 for being on probation during the instant offense. This amounted to a total of 35 prior record variable points. The crime that defendant was convicted of is a Class C offense under MCL 777.16p, and thus, the 70 offense variable points and the 35 prior record variable points placed him in the *419 D-V cell of the sentencing grid for Class C offenses, which contains a “recommended minimum sentence range” of 43 to 86 months, MCL 777.64.

 Once again, in Michigan, the judge does not have the authority to determine a defendant’s maximum sentence, and as a result cannot deprive a defendant of his or her “legal right to a lesser sentence.” Rather, the judge assigns a defendant a minimum parole eligibility date, which represents the earliest possible date on which the defendant may petition the Parole Board for early release. The assignment of a parole eligibility date is not a constitutionally mandated function of the court, but rather is a product of an entirely statutory system in which the Legislature has afforded criminal defendants an opportunity to demonstrate that they are rehabilitated or otherwise deserving of release. If the Parole Board concurs with the defendant, it has the option to release a defendant from prison before the expiration of the maximum sentence. By this process, a Michigan judge never enhances the maximum penal consequences of the jury” s determination of guilt when setting the parole eligibility date. This process does not affect the punishment imposed on the defendant because a criminal defendant released on parole is treated as if he or she is still serving the sentence, MCL 791.238, and because a defendant has no constitutional right to an early release on parole, Greenholtz v Inmates of Nebraska Penal & Correctional Complex, 442 US 1, 11; 99 S Ct 2100; 60 L Ed 2d 668 (1979).

 “[A] defendant does not have a [constitutional] right to anything less than the maximum sentence authorized by the jury’s verdict,” and the Sixth Amendment only “ensures that a defendant will not be incarcerated for a term longer than that authorized by the jury upon finding of guilt beyond a reasonable doubt.” Drohan, 475 Mich at 159, 163.

 Some examples of Michigan’s “mandatory minimum” type of sentence include MCL 769.12(l)(a) (requiring a mandatory minimum sentence for a felon who has been convicted of certain felonies on three or more occasions), MCL 750.520b (requiring a mandatory minimum of 25 years for certain defendants convicted of first-degree criminal sexual conduct), MCL 750.227b (requiring a 2-year mandatory sentence for criminals who use firearms to commit or attempt to commit a felony), and MCL 750.316 (requiring a sentence of life without parole for persons convicted of first-degree murder). None of these statutes is at issue in this case.

 Chief Justice Roberts wrote in dissent on behalf of himself and two other justices. In his view, the majority erred by transforming the Sixth Amendment into “a protection for judges from the power of the legislature” even though the “Framers envisioned the Sixth Amendment as a protection for defendants from the power of the Government.” Alleyne, 570 US at_; 133 S Ct at 2168 (Roberts, C.J., dissenting). The dissent concluded that “the jury’s verdict fully authorized the judge to impose a sentence of anywhere from five years to life in prison,” and thus “[n]o additional finding of fact was ‘essential’ to any punishment.. . .” Id. at_; 133 S Ct at 2169. Because “[t]he jury’s verdict authorized the judge to impose the sentence he imposed for the precise factual reason he imposed it,” the dissent believed the Sixth Amendment was not implicated. Id. at_; 133 S Ct at 2170. Justice Alito also wrote in dissent, asserting that the majority erred by overruling “well-entrenched precedent with barely a mention of stare decisis.” Id. at_; 133 S Ct at 2172 (Alito, J., dissenting). He proceeded to counsel that “[i]f the Court is of a mind to reconsider existing precedent, a prime candidate should be Apprendi . .. .” Id. at_; 133 S Ct at 2172.

 Indeed, Michigan amended its most recent Constitution to specifically enable indeterminate sentencing. See Const 1963, art 4, § 45 (“The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences.”); Ughbanks v Armstrong, 208 US 481, 485; 28 S Ct 372; 52 L Ed 582 (1908) (“An act providing for an indeterminate sentence was first passed in Michigan on July 1, 1889, and was declared unconstitutional.... A constitutional amendment was subsequently adopted (1901), which authorized the legislature to provide for an indeterminate sentence law, as punishment for crime, on conviction thereof.”) (citations omitted).

 It should be emphasized that defendant has not raised a challenge under our state Constitution, choosing not to argue that it affords any greater or distinctive rights than the United States Constitution. Accordingly, our analysis here is confined to the latter, and I offer no opinion concerning the requirements of Michigan’s own Constitution.

 Michigan still has an “indeterminate” sentencing system in which a judge cannot infringe the constitutional authority of the jury. Const 1963, art 4, § 45; Drohan, 475 Mich at 163. The jury is charged with *432 finding each of the elements necessary to ultimately determine at what moment a defendant’s “legal right” to freedom from incarceration will be restored. The Sixth Amendment affords a criminal defendant nothing more.

 In 1996, according to the Bureau of Justice Statistics (BJS), 36 states, including Michigan, and the District of Columbia had adopted some form of indeterminate sentencing. Bureau of Justice Assistance, 1996 National Survey of State Sentencing Structures (1998), pp 4-5 <https://www.ncjrs.gov/pdf61es/169270.pdf> (accessed July 21, 2015) [http://perma.cc/34R3-WPYH]. To distinguish between systems with indeterminate and determinate sentencing schemes, the BJS considered whether parole release remained available for a significant fraction of cases. Id. at 1-2. The 14 states identified as having determinate sentencing were all states that had eliminated parole release. Id. at 1.

 This is identical to the common-law sentencing system discussed favorably in a part of Justice Thomas’s opinion in Alleyne that only Justices Ginsburg, Sotomayor, and Kagan joined:
At common law, the relationship between crime and punishment was clear. As discussed in Apprendi, “[t]he substantive criminal law tended to be sanction-specific,” meaning “it prescribed a particular sentence for each offense.” The system left judges with little sentencing discretion: once the facts of the offense were determined by the jury, the “judge was meant simply to impose [the prescribed] sentence.” [Alleyne, 570 US at_; 133 S Ct at 2158 (citations omitted) (alterations in original).]

 The majority believes that “after Alleyne, the Legislature may not require judicial fact-finding that results in a mandatory increase in either the minimum or the maximum sentence beyond the range set by the jury verdict.” To support this, it relies on the Alleyne dissent of Chief Justice Roberts. First and most obviously, the Chief Justice’s comments are in a dissent and thus not controlling. Second, this dissent states that the statute requiring the trial court to raise defendant’s minimum sentence from 5 to 7 years if it determines that the defendant brandished a firearm “has no effect on the role of the jury.” Id. at_; 133 S Ct at 2168 (Roberts, C.J., dissenting). The majority in Alleyne seems to have found this statement to be incorrect given that it reached the opposite conclusion, holding that allowing the trial court to alter the sentence range on the basis of its own factual finding did have an “effect on the role of the jury” because while the “range supported by the jury’s verdict was five years’ imprisonment to life,” the statute precluded the trial court from considering that range and instead required it to consider only the range of seven years’ imprisonment to life. Alleyne held that the jury must make all factual findings that authorize the prescribed sentence range and because the statute allowed the judge to make findings that altered the range, the defendant’s Sixth Amendment right to a jury trial had been violated. Furthermore, Alleyne had no apparent difficulty with the legislature’s requiring the trial court to sentence the defendant to a term of at least 5 years, despite the fact that such a mandatory minimum was what most obviously limited the discretion of the judiciary in the first place. Moreover, the Alleyne majority also had no difficulty with the legislature’s requiring the trial court to sentence the defendant to at least 7 years when he brandished a firearm. Its only difficulty was with having the trial court, rather than the jury, find that the defendant had brandished a firearm. In other words, the majority seemed little concerned that the legislature was requiring the trial court to sentence the defendant to a mandatory minimum and thus curtailing the court’s own discretion. Instead, it was concerned only that the court itself had decided a matter that altered the permissible sentence limit set by the jury’s verdict and thereby aggravated the punishment.

 Further, it would make little sense to hold that an increase in the amount of time a prisoner must wait before becoming eligible for parole constitutes an increase in criminal punishment because that understanding would also require facts found by the Parole Board to deny parole to be instead found by jury. The Supreme Court, however, has squarely rejected this understanding. Greenholtz, 442 US at 11.

 Even if a jury were somehow required to determine these facts, they would not have to be proved beyond a reasonable doubt since due process has never been applied to protect a mere “asserted interest in the possibility of parole.” Id.

 Wolff v McDonnell, 418 US 539, 556-571; 94 S Ct 2963; 41 L Ed 2d 935 (1974) (holding that although revocation of good-time credits implicates due process because of its depriving an inmate of a cognizable liberty interest, the parole board may revoke good-time credits without impaneling a jury under the Sixth Amendment).

 Morrissey v Brewer, 408 US 471, 484; 92 S Ct 2593; 33 L Ed 2d 484 (1972) (holding that a criminal defendant has certain due process rights when his or her partial liberty granted through the parole board is revoked). When discussing what specific process is due, the Court required the following:
(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a “neutral and detached” hearing body such as a traditional parole hoard, members of which need not be judicial *438 officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. [Id. at 489.]
It is noteworthy that the Court did not require a jury to determine any fact, or any fact to be proved, beyond a reasonable doubt. This is because a parole proceeding is simply not a “criminal” prosecution, as the Court went on to state:
We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial. [Id.]

 The majority views United States Supreme Court decisions addressing parole eligibility as inapplicable to the present analysis because they concern only the Due Process Clause. Because Alleyne and Apprendi pertain to both the Sixth Amendment and the Due Process Clause, the majority believes that decisions addressing only one of these rights are irrelevant. Under this rationale, any decision addressing more than a single constitutional right apparently can only provide guidance in a later case addressing the identical combination of constitutional rights. This argument is meritless, in my judgment. The Supreme Court’s parole eligibility decisions under the Due Process Clause are relevant to the present analysis for the simple reason that this same Due Process Clause is again at issue in the present case and in the identical context, the constitutional relevance of the parole decision. Indeed, the Supreme Court in Apprendi framed the issue as one dealing exclusively with the Due Process Clause. Apprendi, 530 US at 469 (“The question presented is whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt.”) (emphasis added). The majority’s error in choosing to ignore this line of precedent will become increasingly apparent when this Court must specifically rely on it precisely to address challenges to parole eligibility that will almost certainly follow in the wake of the present decision. If a judge’s increase in a defendant’s minimum parole eligibil *439 ity date constitutes an increase in “punishment,” as the majority now asserts, so too seemingly is the parole board’s decision to deny parole. Contra Greenholtz, 442 US at 11; Morrissey, 408 US at 484. Furthermore, it is clear the Supreme Court did impliedly give consideration to the Sixth Amendment in its parole decisions, as it stated that the decision to delay or deny parole can be made by a “neutral and detached hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers.” Morrissey, 408 US at 489.

 See Greenholtz, 442 US at 7 (“Decisions of the Executive Branch, however serious their impact, do not automatically invoke due process protection; there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations. .. . This is especially true with respect to the sensitive choices presented by the administrative decision to grant parole release.”); Morrissey, 408 US at 489 (holding that due process at parole revocation proceedings requires “a ‘neutral and detached’ hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers”).

 A defendant is only legally entitled to be freed from punishment upon serving the statutory maximum sentence. The defendant may be released from the punishment imposed pursuant to the jury’s verdict sooner than this date, but the decision to free a prisoner from his or her punishment remains always a discretionary decision within the authority of the Parole Board.

 This distinction has been acknowledged by justices of the United States Supreme Court. See, e.g., Harris, 536 US at 570-571 (Breyer, J., dissenting) (“Unlike Guideline sentences, statutory mandatory minimums generally deny the judge the legal power to depart downward, no matter how unusual the special circumstances that call for leniency.”).

 MCL 769.34(2)(a), for example, provides:
If a statute mandates a minimum sentence for an individual sentenced to the jurisdiction of the department of corrections, the court shall impose sentence in accordance with that statute. Imposing a mandatory minimum sentence is not a departure under this section. If a statute mandates a minimum sentence for an individual sentenced to the jurisdiction of the department of corrections and the statute authorizes the sentencing judge to depart from that minimum sentence, imposing a sentence that exceeds the recommended sentence range but is less than the mandatory minimum sentence is not a departure under this section. If the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, mandates a minimum sentence for an individual sentenced to the jurisdiction of the department of corrections and the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, authorizes the sentencing judge to impose a sentence that is less than that minimum sentence, imposing a sentence that exceeds the recommended sentence range but is less than the mandatory minimum sentence is not a departure under this section. [Emphasis added.]

 Thus, fact-finding by a Michigan judge fits within the “broad sentencing discretion” belonging to that judge that does not violate the Sixth Amendment. See Alleyne, 570 US at_; 133 S Ct at 2163 (“ ‘[E]stablish-ing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things.’ Our decision today is wholly consistent with the broad discretion of judges to select a sentence within the range authorized by law.”) (citations omitted) (alteration in original).

 Take the defendant in Jones, for example. He was found guilty of a crime that carried a 15-year maximum sentence. Jones, 526 US at 231. When the judge found an additional fact—that the victim had suffered substantial bodily injury—it was required to sentence the defendant to a 25-year term. Id. Thus, the judge was able to sentence the defendant beyond the limit authorized by the jury’s verdict and accordingly could deprive him of his “legal right to a lesser sentence.” This simply cannot happen in an indeterminate system because a defendant is always subject to serving the maximum sentence and the judge can never interfere with this imposition of criminal punishment.

 See United States v Ibrahim, 529 F Appx 59, 64 (CA 2, 2013) (“Because the Sentencing Guidelines are advisory rather than mandatory, application of guidelines enhancements that do not increase the statutory maximum or minimum penalty neither implicates nor violates a defendant’s Sixth Amendment right to a jury trial.”) (citation omitted); United States v Tuma, 738 F3d 681, 693 (CA 5, 2013) (“[Defendant’s] sentence did not expose him to a mandatory minimum sentence and was well within the sentencing discretion of the district court; therefore, Alleyne is inapplicable.”); United States v Johnson, 732 F3d 577, 583-584 (CA 6, 2013) (holding that judicial fact-finding of crack cocaine quantity does not violate Alleyne rule because it does not alter a mandatory minimum sentence); United States v Baum, 542 F Appx 724, 727 (CA 10, 2013) (holding that the district court’s fact-finding for guidelines purposes, without altering the mandatory minimum, was permissible under Alleyne); United States v Ramírez-Negrón, 751 F3d 42, 49 (CA 1, 2014) (“We flatly reject the proposition that all drug quantity calculations made under the advisory Guidelines must be *447 submitted to a jury.. .. No Alleyne error occurs when a defendant’s sentence is based entirely on Guidelines considerations without changing the applicable mandatory minimum.”); United States v Robinson, 556 F Appx 68, 70 (CA 3, 2014) (holding that the district court “retained the ability to make factual findings necessary to calculate [the defendant’s] advisory Sentencing Guidelines range” without submitting those questions to a jury); United States v Holder, 549 F Appx 214, 215 (CA 4, 2014) (“[Ajlthough judicially determined facts are no longer relevant after Alleyne to deciding the applicable mandatory minimum, the factual findings needed to calculate a defendant’s advisory Guidelines range are still within the district court’s province.”); United States v Valdez, 739 F3d 1052, 1054 (CA 7, 2014) (holding that when “[t]here is no indication . .. that the district judge thought her sentencing discretion was cabined by a higher statutory minimum” than that supported by the drug quantities charged or admitted by the defendant, the district court’s calculation of “a greater drug quantity solely for purposes of determining [the defendant’s] Guideline range” did not violate Alleyne rule); United States v Battle, 774 F3d 504, 516 (CA 8, 2014) (stating that “[i]n applying the [sentencing] enhancement, the court neither exceeded the statutory maximum nor increased a statutory mandatory minimum” and “[t]hus the court did not err in conducting its own fact-finding for the purposes of applying the enhancement”); United States v Lizarraga-Carrizales, 757 F3d 995, 998 (CA 9, 2014) (“ ‘Alleyne, by its terms, applies to facts that “increase[ ] the mandatory minimum.” [The defendant] suggests that Alleyne applies more broadly.... We do not read Alleyne so expansively. Afact that precludes safety-valve relief does not trigger or increase the mandatory minimum, but instead prohibits imposition of a sentence below a mandatory minimum already imposed as a result of the guilty plea or jury verdict.’ ”), quoting United States v Harakaly, 734 F3d 88, 98 (CA 1, 2013) (alterations in original); United States v Cassius, 777 F3d 1093, 1099 (CA 10, 2015) (upholding a district court’s imposition of a mandatory minimum sentence when “the court made clear elsewhere at sentencing .. . that only one count required a mandatory minimum,” stating that “[m]ost importantly, the Court explicitly discussed Alleyne at sentencing [and] noted that it only applied where mandatory minimum sentences were increased due to judicial fact-finding’) (emphasis added); United States v Charles, 757 F3d 1222, 1225 (CA 11, 2014) (holding that “a district court may continue to make guidelines calculations based upon judicial fact findings and may enhance a sentence—so long as its findings do not increase the statutory maximum or [mandatory] minimum authorized by facts determined in a guilty plea or jury verdict”). While I recognize that these are federal cases and none, of course, deals specifically with *448 an application of Alleyne to Michigan’s sentencing system, each circuit has simply examined whether there was a mandatory minimum in the traditional sense, and when it was determined that there was no such mandatory minimum, that was the end of the analysis.

 See e.g., United States v Lara-Ruiz, 721 F3d 554 (CA 8, 2013) (remanding for resentencing when judicially found facts were used to increase a mandatory minimum sentence from 5 to 7 years under 18 USC 924(c)); United States v Hackett, 762 F3d 493 (CA 6, 2014); United States v Lira, 725 F3d 1043 (CA 9, 2013).

 “At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without ‘due process of law,’ [US Const] Arndt. 14, and the guarantee that ‘[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury, [US Const] Amdt. 6.’ ” Apprendi, 530 US at 476-477(seeond alteration in original). “The Sixth Amendment provides that those ‘accused’ of a ‘crime’ have the right to a trial ‘by an impartial jury.’ This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt.” Alleyne, 570 US at_; 133 S Ct at 2156.

 Greenholtz, 442 US 1.

 Morrissey, 408 US 471.

 Each decision results in a convicted person being required to serve a greater or lesser part of his or her overall punishment in prison.

 Before Alleyne, the judge could unilaterally increase the bottom end of this sentence range authorized by the jury’s verdict. Thus, the judge could increase the range from 3 to 10 years to 5 to 10 years. Alleyne clearly stands for the proposition that both ends of this range are constitutionally significant and that judges can no longer alter either end of the range produced by the jury’s verdict. What the majority fails to recognize is that the constitutional problem identified in Alleyne does not exist in systems in which the jury’s verdict establishes a single number and not a sentence range.

 Unlike the common law, Michigan law established a parole system that allows prisoners to be released before serving the entirety of the punishment imposed on them as a result of the jury’s verdict, but this does not alter the constitutional analysis because criminal defendants have no constitutional right to parole. Greenholtz, 442 US at 11. Because defendants have no such right, there is only a single date at sentencing that is constitutionally significant and that is the date resulting from the statutory maximum. As a result, our system mirrors that of the common law for purposes of a constitutional analysis.

 Because I conclude that Michigan’s sentencing system does not violate the Sixth Amendment, I need not address the appropriate remedy for what I view as a nonexistent violation. Nonetheless, I submit that the majority has not been persuasive in its adoption without modification or significant analysis the so-called Booker remedy that renders the sentencing guidelines “advisory only” (meaning that the guidelines no longer have any binding effect) and imposing a “reasonableness” standard of review for sentences that depart from the now-advisory guidelines (meaning that the guidelines no longer have even any presumptive effect). The United States Supreme Court in Booker engaged in a lengthy severability analysis that sought to discern and maintain to the extent possible the legislative intentions of the Congress. See Booker, 543 US at 246 (“We seek to determine what ‘Congress would have intended’ in light of the Court’s constitutional holding.”). This Court, on the other hand, by its severability analysis is obligated to discern the legislative intentions of our Legislature. By simply importing the Booker remedy to Michigan with no particularized analysis of our own Legislature’s intentions and no assessment of available alternative approaches to severability, the majority misapprehends its judicial obligations after it has struck down a law of this state. Booker, for example, set forth the “reasonableness” standard *463 of review for departures from the federal guidelines because the “pre-2003 text [of 18 USC 3742(e)] directed appellate courts to review sentences that reflected an applicable Guidelines range for correctness, but to review other sentences—those that fell ‘outside the applicable Guideline range’—with a view toward determining whether such a sentence ‘is unreasonable ...” Id. at 261, quoting 18 USC 3742(e)(3). “In other words, the text [of 18 USC 3742(e)(3)] told appellate courts to determine whether the sentence is ‘unreasonable’ with regard to [18 USC] 3553(a).” Id. Only for this reason did the United States Supreme Court “read the statute as implying this appellate review standard—a standard consistent with appellate sentencing practice during the last two decades.” Id. at 261-262. However, in Michigan, before the enactment of the legislative sentencing guidelines, appellate courts reviewed sentences under the judicial guidelines for “proportionality.” People v Milbourn, 435 Mich 630, 636; 461 NW2d 1 (1980) (“[A] given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.”). Accordingly, the standard of review summarily imposed in Michigan by the majority is disconnected from any consideration of this state’s prior standard of review, however irrelevantly consistent it may be with the United States Supreme Court’s post-severability analysis standard.
Nor does the majority even acknowledge, much less discuss, Justice Stevens’s lengthy dissent in Booker (joined by Justices Scalia and Souter), in which he argued that the remedy adopted by the majority in that case (also adopted by the majority in this case) undermined the motivating purpose underlying the guidelines to an unnecessary extent. In enacting the federal guidelines, “Congress revealed both an unmistakable preference for the certainty of a binding regime and a deep suspicion of judges’ ability to reduce disparities in federal sentencing.” Booker, 543 US at 292 (Stevens, J., dissenting in part). When Booker made the entire sentencing system “advisory,” as the majority does in the instant case, it created a sentencing regime that was “starkfly]” different from the one Congress had intended. Id. at 300. Furthermore, Justice Stevens believed that the majority’s decision to modify the guidelines by striking down the portions making them mandatory was an “extraordinary” “exercise of legislative, rather than judicial, power,” id. at 272, 274, because the guidelines were not facially unconstitutional; that is, the guidelines could be constitutionally applied in situations in which the judge did not find facts that increased the *464 defendant’s punishment, id. at 275-276. It was only when the judge himself found such facts that the guidelines were applied in an unconstitutional maimer. Justice Stevens advocated a remedy that did not contemplate a wholesale revision of the guidelines, but rather one that merely prevented judges from finding facts that increased the range of punishment faced by the defendant. He believed this remedy to be the most appropriate because it retained the mandatory character of the guidelines, which in his view constituted the “heart” of the guidelines system, id. at 299, and it also left the guidelines intact in all other situations in which a judge does not find facts that increase the defendant’s punishment or the jury decides those facts. The majority here apparently did not even consider such a remedy despite the fact that, as with the federal guidelines, there is ample evidence that the mandatory character of Michigan’s guidelines was also viewed by our Legislature as an essential characteristic, particularly in light of the fact that the guidelines were enacted specifically to replace Michigan’s nonbinding judicial guidelines. That is, our guidelines could similarly be applied in a constitutional manner as long as the judge does not find facts that increase a defendant’s punishment, or the jury does.
I am also unpersuaded by the majority’s assertion that if anAlleyne objection is unpreserved and pending on direct appeal, a remand is required “to determine whether [the sentencing] court would have imposed a materially different sentence but for the constitutional error.” (Emphasis added.) While the majority is correct that the appropriate standard of review for an unpreserved claim of constitutional error is whether a “plain error affected substantial rights,” People v Carines, 460 Mich 750, 763; 597 NW2d 130 (1999), a defendant’s “substantial rights” would seem to have been affected by even a few months or weeks or days of unconstitutional incarceration. Why should not any defendant whose sentence is pending and who has been adversely affected by the now-defunct sentencing guidelines receive an opportunity for resentenc-ing? Which now-unconstitutional lengthier terms of incarceration are viewed as sufficiently “material” to warrant relief?